## SCHOOL COMMITTEE OF PITTSFIELD *vs.* UNITED EDUCATORS OF PITTSFIELD.

Berkshire. November 7, 2002. - February 28, 2003.

Present: MARSHALL, C.J., GREANEY, COWIN, SOSMAN, & CORDY, JJ.

*Arbitration,* School committee, Collective bargaining, Vacating award, Arbitrable question, Authority of arbitrator. *Public Policy. School and School Committee,* Collective bargaining, Arbitration, Transfer of employees, School principal, Superintendent of schools. *Education Reform Act.*

Discussion of the scope and purpose of G. L. c. 71, § 59B, granting broad managerial authority to school principals to "hire" teachers, its relation to other provisions of the Education Reform Act of 1993, St. 1993, c. 71, and its relation to laws concerning collective bargaining. [759-762]

This court concluded that an involuntary transfer of a special education teacher from one school to another was not the "hiring" of an employee within the meaning of G. L. c. 71, § 59B, and was consonant with the school committee's statutory power to direct the school district's overall staffing, while leaving intact the principal's governing authority over his or her school pursuant to § 59B; therefore, the involuntary transfer was a matter that was properly arbitrable under the collective bargaining agreement between the school committee and the union representing the teacher. [762-765]

CIVIL ACTION commenced in the Superior Court Department on May 15, 2000.

The case was heard by *John A. Tierney,* J., on a motion for judgment on the pleadings.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Daniel R. Wojcik* for the plaintiff.

*Ira Fader* for the defendant.

The following submitted briefs for amici curiae:

*Michael J. Long* for Massachusetts Association of School Superintendents.

*Ann Clarke, Judith Neumann, Jeffrey W. Jacobsen, Mary T. Sullivan, & Donald J. Siegel* for Massachusetts AFL-CIO & others.

MARSHALL, C.J. We are asked to determine whether, in the wake of the Education Reform Act of 1993, St. 1993, c. 71 (Reform Act), the involuntary transfer of a special education teacher from one school to another is a matter that is properly arbitrable under a collective bargaining agreement between a school committee and a union representing the teacher.[1] The plaintiff, the school committee of Pittsfield (school committee), appeals from a Superior Court judge's order dismissing its application under G. L. c. 150C, § 11, to vacate an arbitration award. The arbitrator concluded that the school committee had violated its collective bargaining agreement with the defendant, United Educators of Pittsfield (union), when it ordered the involuntary transfer of a teacher, Karen Woolis, to a position in a different school. He ruled that the teacher must be reinstated to her former position, or a comparable one, at her former school and be paid the supplemental stipend that she would have received but for the transfer. The judge entered judgment on the pleadings for the union and affirmed the award. We transferred the case to this court on our own motion, and now affirm the judgment.

1. *Background.* The case was submitted to the Superior Court judge on the pleadings. The parties do not dispute the arbitrator's factual findings, which we summarize. This controversy arose at the end of the 1998-1999 school year. At that time, Woolis had worked in the Pittsfield school system for eleven years as a resource room teacher at the Egremont Elementary School (Egremont). Woolis was a teacher entitled to "professional teacher status"[2] certified to teach mild-to-moderate special-needs students from preschool to grade nine.

---

[1] We acknowledge the amicus brief of the Massachusetts AFL-CIO; Massachusetts Teachers' Association; Massachusetts Federation of Teachers; Service Employees International Union; American Federation of State, County, and Municipal Employees, Council 93; Massachusetts Laborers' District Council; SEIU Local 3, National Conference of Firemen & Oilers; SEIU Local 285; SEIU Local 509; United Food and Commercial Workers Union, Local 1495; and United Food and Commercial Workers Union, Local 328. We also acknowledge the amicus brief of Massachusetts Association of School Superintendents.

[2] "[A] teacher . . . who has served in the public schools of a school district for the three previous consecutive school years shall be considered a teacher, and shall be entitled to professional teacher status as provided in section forty-two." G. L. c. 71, § 41. General Laws c. 71, § 42, provides a teacher with "professional teacher status" with privileges that include, among others, the

At Egremont, she worked with special-needs students on an as-needed basis. Although she was a member of the "building assessment team" that determined individual education plans for students, she was not involved in developing students' educational curricula. Woolis was also Egremont's "building technology integrator" (BTI), working with teachers to integrate technology into the classroom. Woolis earned an annual stipend of $2,500 for the BTI position.

The terms of Woolis's employment as a teacher in the Pittsfield school district were covered by a collective bargaining agreement (agreement) between the school committee and the union, effective August 28, 1996, through August 25, 1999. The agreement identifies the union as "the exclusive bargaining agent for the purposes of collective bargaining in respect to . . . conditions of employment for: All full and part-time classroom teachers . . . teachers of students with special needs . . . and all other employees of the [Pittsfield] school system." Among other things, it sets forth a procedure for the involuntary transfer of teachers,[3] and provides for final and binding arbitration of grievances that cannot be resolved administratively.[4]

In May, 1999, shortly after expressing frustration with her job

right that she "not be dismissed except for inefficiency, incompetency, incapacity, conduct unbecoming a teacher, insubordination or failure on the part of the teacher to satisfy teacher performance standards developed pursuant to section thirty-eight of this chapter or other just cause." Prior to the enactment of the Education Reform Act of 1993, St. 1993, c. 71, § 43 (Reform Act), G. L. c. 71, § 41, did not encompass "professional teacher status." See G. L. c. 71, § 41, as amended through St. 1990, c. 404, § 2.

[3]Article VII, § 4, of the agreement states: "Teachers may be involuntarily transferred by the COMMITTEE or the Superintendent of Schools to a comparable position. Such a transfer will be made only after a meeting between the teacher and the Superintendent (or his designee), at which time the teacher will be notified of the reasons for the transfer. In the event that a teacher objects to the transfer at this meeting, upon the written request of the teacher, the [union] will be notified and the Superintendent (or his designee) will meet with the [union's] representative to discuss the transfer, provided however, that transfer will be subject to the grievance procedure but the decision of the COMMITTEE will be final."

[4]The agreement defines a "grievance" as "a complaint that there has been a violation, misinterpretation, or misapplication of this Agreement or any amendment or supplement thereto." Article V of the agreement sets out a number of "steps" for the parties to follow to resolve a grievance administratively at the levels of "[i]mmediate [s]uperior," superintendent, and school committee, respectively. Article V further provides that, if the grievance is not settled

to Stephanie Case, who is described in the record only as "supervisor of special education," Woolis was approached by Michael Meyer, the acting director of special education, who asked her to consider a teaching position in the special education program at Herberg Middle School (Herberg).[5] Woolis agreed to explore the option. She visited the Herberg program and discussed it with several of the paraprofessionals who worked there. Woolis learned that the Herberg position was significantly different from her position at Egremont: the children were older and had more severe disabilities[6]; her class would be composed solely of special-needs children for whom she would be the sole responsible teacher; her classroom would be less spacious and the technological resources less up to date than at Egremont; and her working hours would change significantly. Woolis concluded that she was not properly certified for the position, and decided that a move to Herberg would not be in her best professional interest. She declined Meyer's offer.

Nevertheless, Meyer believed that Woolis, an experienced and competent educator, would do well at Herberg, where the

administratively, the grievant may file for arbitration, and the arbitrator's decision will be "final and binding."

[5]Although not stated in the record, as acting director, Meyer appears to be fulfilling the statutorily mandated role of administrator of special education. General Laws c. 71B, § 3A (a), (b), requires that a school committee appoint an administrator of special education to supervise "the provision of all special education in the school system." The administrator, however, has no explicit hiring powers in regard to special education teachers. See id. Instead, in accordance with the rules and regulations promulgated by the Department of Education, "[t]he principal with the assistance of the Administrator of Special Education shall coordinate the delivery and supervision of special education services within each school building." 603 Code Mass. Regs. § 28.03(3)(b) (2001).

[6]The arbitrator found that the Egremont position was a "502.2" position and the Herberg position was a "502.4" position. These numbers refer to regulations jointly issued by the Department of Education and the Department of Social Services in accordance with St. 1972, c. 766, the special education statute that contains "prototypes" reflecting "the amount of time that a child in need of special education is separated from children not receiving special education services." 110 Code Mass. Regs. § 7.401(7) (1993). Prototype 502.2 refers to children who need less than twenty-five per cent time outside the regular education classroom and prototype 502.4 refers to children who need more than sixty per cent time outside the regular education classroom.

current special education teacher was "struggling." The day after Woolis informed Meyer and Case that she declined the transfer, Meyer and Case met with Woolis in the hopes of persuading her to change her mind. When she did not, Meyer handed Woolis a letter stating that he was in any event transferring her to the Herberg position for the 1999-2000 academic year. The teacher whom Woolis was replacing had agreed to a voluntary transfer to Egremont. Meyer testified that "he discussed the matter with the principals at the schools and they agreed to the personnel moves."

Woolis, viewing Meyer's action as an involuntary transfer, filed a grievance challenging the transfer. She also argued to the assistant superintendent and the Department of Education (department) that she was not qualified for the new position. The department determined that Woolis was qualified for the position at Herberg. When she did not succeed in resolving the grievance administratively, Woolis, represented by the union, submitted the dispute to binding arbitration. See note 4, *supra.* She sought recision of the transfer directive and a restoration of her $2,500 yearly BTI stipend.

The school committee presented the following issue to the arbitrator: "Whether the decision to involuntarily transfer a teacher is arbitrable under the terms of the collective bargaining agreement and under state law." The union raised one issue: "Did the administration violate the Collective Bargaining Agreement by the manner in which it transferred Karen Woolis from Egremont Elementary School to Herberg Middle School? If so, what shall be the remedy?" After an arbitration hearing, the arbitrator issued a written decision that set out his factual findings, reasoning, and conclusions, as the agreement required him to do. He determined, first, that the matter was arbitrable because (1) it concerned a grievance based on the provision of the agreement concerning involuntary transfers, and (2) the provision was not invalid under G. L. c. 71, § 59B, as amended by the Reform Act, governing the managerial authority of principals, or the regulations promulgated under St. 1972, c. 766, concerning special education. Turning to the merits, he found that the school committee had violated the agreement because it did not transfer Woolis to a comparable position. He ordered

Woolis reinstated to the same or a comparable position at Egremont and ordered the school committee to pay Woolis the BTI stipend that she would have received had she remained at Egremont.

The school committee sought to vacate the arbitrator's award in the Superior Court. See G. L. c. 150C, § 11. In an order and memorandum on the school committee's motion for judgment on the pleadings, the judge, reviewing only the question of arbitrability, concluded that, because involuntary transfers implicate district-wide personnel policies, the matter of involuntary transfers is properly within the ambit of collective bargaining and arbitration between the school committee and the union and not contrary to any of the provisions of the Reform Act.

2. *Scope of review.* Public policy in the Commonwealth strongly encourages arbitration. *Plymouth-Carver Regional Sch. Dist.* v. *J. Farmer & Co.*, 407 Mass. 1006, 1007 (1990), and cases cited. Arbitration has long been viewed as a particularly appropriate and effective means to resolve labor disputes. See, e.g., G. L. c. 150E (collective bargaining between public employers and employees). Arbitration would have little value if it were merely an intermediate step between a grievance and litigation in the courts. For this reason, the Legislature has narrowly circumscribed the grounds to vacate arbitral awards, and a party challenging such an award faces formidable obstacles. See G. L. c. 150C, § 11[7]; *Plymouth-Carver Regional Sch. Dist.* v. *J. Farmer & Co.*, *supra*. Absent proof of one of the grounds enumerated in G. L. c. 150C, § 11, to vacate arbitral awards, we are strictly bound by the arbitrator's factual findings and conclusions of law, even if they are in error. See *Lynn* v. *Thompson*, 435 Mass. 54, 61-62 (2001), and cases cited.

Here, the school committee claims that the matter before the arbitrator is not arbitrable because it concerns a matter — involuntary transfers — that is the exclusive province of school principals pursuant to G. L. c. 71, § 59B. See G. L. c. 150C,

---

[7]General Laws c. 150C, § 11 (*a*) (3), states: "Upon application of a party, the superior court shall vacate an award if: —

"(3) the arbitrators exceeded their powers or rendered an award requiring a person to commit an act or engage in conduct prohibited by state or federal law . . . ."

§ 11 (*a*) (3). In considering the school committee's claim, "we look only to determine if the arbitrator here exceeded his scope of reference, acted against clearly defined public policy, or ordered conduct prohibited by State or Federal law." *Duxbury* v. *Duxbury Permanent Firefighters Ass'n, Local 2167,* 50 Mass. App. Ct. 461, 464 (2000). See *Plymouth-Carver Regional Sch. Dist.* v. *J. Farmer & Co., supra* at 1007. Whether the arbitrator exceeded his authority must be determined on a case-by-case basis. *Higher Educ. Coordinating Council/Roxbury Community College* v. *Massachusetts Teachers' Ass'n/Mass. Community College Council,* 423 Mass. 23, 31-32 (1996). For the reasons stated below, we conclude that the arbitrator did not exceed his powers or render an unlawful award, and that the judgment declining to vacate the award should be affirmed.

3. *Analysis.* The school committee contends that resort to arbitration is precluded by the Reform Act, St. 1993, c. 71, § 53, which vests the decision to hire or fire individuals employed in a particular public school with the school's principal. While conceding, as it must, that G. L. c. 71, § 59B, does not explicitly refer to a principal's authority over the involuntary transfer of teachers, the school committee contends that such power is necessarily encompassed within the broad managerial authority given to principals in § 59B to "hire" teachers. This position requires us to examine the scope and purpose of § 59B, its relation to other provisions of the Reform Act, and its relation to laws concerning collective bargaining. Cf. *Bradley* v. *School Comm. of Boston,* 373 Mass. 53, 57 (1977) (noting that collective bargaining agreements relating to school personnel often implicate "a composite of issues affecting conditions of employment and issues affecting educational policy").

General Laws c. 71, § 59B, is but one of the 105 provisions enacted as the Reform Act. The Reform Act was intended as a "comprehensive reform of our public schools" meant to "ensure[] that all of our children will be prepared to compete in the global economy." Education Reform Act of 1993, Conference Committee Report (May 24, 1993). See G. L. c. 69, § 1. Major features of the Reform Act include the establishment of performance standards for students, St. 1993, c. 71, § 29; the

abolition of teacher tenure, St. 1993, c. 71, § 44; the authoriza-
tion of charter schools, St. 1993, c. 71, § 55; and the creation
of a new school financing formula, St. 1993, c. 71, § 32. The
Reform Act also significantly alters the management and ac-
countability structures of public schools. See St. 1993 c. 71,
§ 53. Prior to passage of the Reform Act, responsibility for hir-
ing and firing teachers resided with the local school committees,
see *Higher Educ. Coordinating Council/Roxbury Community
College* v. *Massachusetts Teachers' Ass'n/Mass. Community
College Council, supra* at 29 n.6, a process that the conference
committee's report described as imposing "[b]ureaucratic and
political barriers to reform." Under the Reform Act, the school
committee retains "the authority to 'establish educational goals
and policies for the schools in the district' " and the "[r]espon-
sibility for hiring or terminating a school superintendent." *Id.,*
quoting G. L. c. 71, § 37, as amended. Superintendents, in turn,
are responsible for appointing school principals, while principals
assume primary responsibility for hiring, disciplining, and
terminating teachers and "other personnel assigned to the
school," subject to the "approval" of their superintendents.
G. L. c. 71, § 59B. The impetus for enhancing school principals'
management authority was to increase their accountability. As
described in the conference committee's report, "Principals will
be put in charge of their schools with the elimination of school
committee hiring and firing. With increased managerial powers
over the day to day operations of their schools, principals will
be held accountable for performance."[8] See 1992 House Doc.
No. 5750 at 2 (letter from Governor introducing bill) ("Princi-
pals will be clearly established as part of the management team
of the school district, with strict accountability for educational
performance").

In changing the management structure of schools, however,
the Legislature granted to public school principals only the
degree of managerial latitude that relates to internal school mat-
ters, for which the principal is strictly answerable. Even as it

---

[8]The school committee does not argue on appeal that Meyer, as Pittsfield's
special education director, could have required Woolis to be transferred
involuntarily to another school without the consent of both school principals.

relates to internal school matters, the Legislature did not grant principals unfettered discretion. For example, principals, while they may negotiate individual employee contracts, may not enter into collective bargaining agreements and must follow strict procedural and substantive provisions before firing a teacher with professional status. See G. L. c. 71, § 42, as appearing in St. 1993, c. 71, § 44.[9] Under the Reform Act, the school committee remains the entity that, among other things, determines expenditures within the district's education appropriation, see G. L. c. 71, § 37,[10] sets broad education policy, see id., establishes performance standards for teachers, see G. L. c. 71, § 38, and negotiates and enters into collective bargaining agreements with teachers and other school personnel, see G. L. c. 150E, § 1.[11]

Nor did the Legislature's commitment to school reform trump the Commonwealth's strong public policy favoring collective bargaining between the public employers and employees over

[9]Significantly, principals in "chronically under-performing schools," defined as "[s]chools that have consistently failed to improve the academic performance of their students," have expressly broader authority over personnel decisions than do other public school principals. See G. L. c. 69, § 1J, inserted by § 29 of the Reform Act, which provides in part that the principal of a chronically under-performing school must be "immediately removed and shall not be assigned to the school for the following school year unless the board [of education] finds that the principal did not play a significant role in the under-performance of the school." The superintendent may then designate a new principal, who has "extraordinary powers," including the power to dismiss teachers with professional status, without regard to many of the statutory safeguards for protecting such teachers' positions, see note 2, supra, and without regard to contrary provisions of any collective bargaining agreement. However, teachers so dismissed "otherwise retain such rights as may be provided under law or any applicable collective bargaining agreement." G. L. c. 69, § 1J.

[10]The powers and duties of the school committee are set forth in G. L. c. 71, § 37: "The school committee in each city and town and each regional school district shall have the power to select and to terminate the superintendent, shall review and approve budgets for public education in the district, and shall establish educational goals and policies for the schools in the district consistent with the requirement of law and statewide goals and standards established by the board of education."

[11]For purposes of collective bargaining agreements, G. L. c. 150E, § 1, defines employer as follows: "In the case of school employees, the municipal employer shall be represented by the school committee or its designated representative or representatives."

the conditions and terms of employment.[12] See *School Comm. of Lowell* v. *Labor Relations Comm'n*, 46 Mass. App. Ct. 921 (1999). A school principal may have the authority to fill a vacant position, but personnel policies related to the terms and conditions of employment remain properly the subject of collective bargaining agreements negotiated on behalf of the school district by the school committee as its exclusive bargaining agent. See G. L. c. 150E, §§ 1 and 2. And it has long been the policy in Massachusetts that "a school committee may bind itself to follow certain procedures with respect to decisions committed to its exclusive authority, and a failure to observe those procedures may be the basis for an arbitrable grievance." *Higher Educ. Coordinating Council/Roxbury Community College* v. *Massachusetts Teachers' Ass'n/Mass. Community College Council*, supra at 28.

In sum, by enacting § 59B, the Legislature carefully balanced school-based management reforms with the district-wide needs of school systems and the collective bargaining rights of school employees over the terms and conditions of their employment. See, e.g., *School Comm. of Lowell* v. *Local 159, Serv. Employees Int'l Union*, 42 Mass. App. Ct. 690, 693-694 (1997). We must now consider whether, as the school committee maintains, within these interwoven statutory schemes, the principal's and superintendent's authority to transfer employees involuntarily is a "hiring decision" under § 59B. If so, as the school committee argues, then the involuntary transfer is insulated from the collective bargaining process.

In support of its position, the school committee relies principally on two recent Appeals Court decisions. In *School Comm. of Peabody* v. *Peabody Fed'n of Teachers, Local 1289*, 51 Mass. App. Ct. 909, 911 (2001), the court held that an arbitration award that directed a school committee to transfer certain

---

[12]As the union amici point out in their brief, the Legislature considered and rejected several versions of the Reform Act that would have cut back on the collective bargaining rights of teachers and given principals authority to hire and fire employees and to set performance standards without the express approval of the school superintendent. See 1992 House Doc. No. 5750, §§ 36, 37, 51; 1992 House Doc. No. 5993, § 23. The Legislature clearly did not wish to grant to school principals virtually unreviewable power over personnel decisions in the ordinary case. But see note 9, *supra*.

school employees who had requested, but had been denied, a transfer to a different school violated the provision of § 59B establishing the principal as the sole hiring authority for a school. While recognizing the right of collective bargaining agreements to "establish procedures for applying for transfers and filling vacancies," the Appeals Court nevertheless concluded that the voluntary transfer provisions of the collective bargaining agreement in question, by not recognizing prior approval rights of the principal of the transferee school, violated G. L. c. 71, § 59B, and thus were not arbitrable. Similarly, in *School Comm. of Lowell* v. *Local 159, Serv. Employees Int'l Union, supra,* the Appeals Court ruled that an arbitrator's award directing a school committee to honor the successful bid of a school custodian to transfer from one school to another should be vacated because the relevant provisions of the collective bargaining agreement usurped the principal's and superintendent's power of appointment under G. L. c. 71, § 59B. *Id.* at 692-693. The court noted that, while the statute does not define the word "hire," the term must be "given its ordinary meaning, 'employ.' " *Id.* at 692. "Because it is apparent that the Legislature sought to give to school principals the power to select all teachers and staff assigned to their school, subject to the approval of the school superintendent, we conclude § 59B embraces transfers as well as new hires; otherwise, the principal's power of selection would be thwarted." *Id.*

We agree with the arbitrator and with the judge that *School Comm. of Lowell* v. *Local 159, Serv. Employees Int'l Union, supra,* as well as the subsequent decision, *School Comm. of Peabody* v. *Peabody Fed'n of Teachers, Local 1289, supra,* have little application here. Both cases concerned a voluntary transfer. Woolis's grievance concerns an involuntary transfer. A "voluntary transfer" and an "involuntary transfer" are distinct personnel actions both as a matter of definition and under the collective bargaining agreement.[13] A "voluntary transfer," as was the case in *School Comm. of Peabody* v. *Peabody Fed'n of*

---

[13]Section 3 of Article VII of the collective bargaining agreement is entitled "Transfers," and § 4 is entitled "Involuntary Transfers."

Section 3 states: "Requests by teachers for transfers for the beginning of the school year shall be made in the following manner:

*Teachers, Local 1289, supra* at 910, is an affirmative application made by an employee to move from one school to another. It is, in essence, an application to be hired for a new or different position. In the case of voluntary transfers, a process allowing the applicant to change jobs without the consent of the principal of the transferee school would impair the prerogatives of principals as managers of their schools. See G. L. c. 71, § 59B.

In contrast, an "involuntary transfer" is the movement of an employee from one position to another, not at the employee's request, but to satisfy the general staffing needs of the employer. In the case of the school district, it means the assignment of a school employee from one school to another to satisfy district-wide staffing concerns. Such an involuntary relocation decision is not the "hiring" of an employee in ordinary parlance or within the meaning of § 59B, and is consonant with the school committee's statutory power to direct the district's over-all staffing, while leaving intact the principal's governing authority over his or her school pursuant to § 59B. As such, the involuntary transfer procedure is a proper subject of collective bargaining between the school committee and the union and subject to the binding arbitration provisions of the agreement. See *Plymouth-Carver Regional Sch. Dist.* v. *J. Farmer & Co.,* 407 Mass. 1006, 1007 (1990).[14]

The agreement itself does not define the term "involuntary transfer," but requires that such transfers must be to a "comparable position" and that, after the required procedures are followed, the "transfer will be subject to the grievance procedure

---

"A. Requests for transfers shall be submitted by teachers in writing to the Personnel Office by April 1, indicating subject, grade or school to which the teacher seeks assignment. Such requests will remain valid for two years.

"B. A list of transfer requests shall be maintained by the school system showing the date of the original request. Such lists shall be made available to the [union].

"C. No new appointments may be made until pending transfer requests for existing openings have been considered."

The section describing involuntary transfers is set forth in note 3, *supra*.

[14]Although not raised by the parties, the issue whether, and the degree to which, G. L. c. 150E, § 8, controls a principal's hiring decisions under G. L. c. 71, § 59B, has been raised by the amici. While not an issue in this case, we address this argument in *School Comm. of Newton* v. *Newton Sch. Custodians Ass'n, Local 454, ante* 739, 750-751 (2003).

but the decision of the [school committee] will be final." We agree with the arbitrator that the latter language does not preclude resort to binding arbitration where the agreement provides that a grievance is a "complaint that there has been a violation, misinterpretation, or misapplication of [the] [a]greement" and where resolution of the grievance requires applying and interpreting the agreement's express terms.

Because the parties' dispute is arbitrable, we do not review the arbitration award itself. See *Lynn* v. *Thompson*, 435 Mass. 54, 61 (2001).

4. *Conclusion.* For the foregoing reasons, the decision of the Superior Court judge to enter judgment on the pleadings for the union and to affirm the arbitrator's award is affirmed.

*So ordered.*