454 Mass. 19 (2009)                                          19

Massachusetts Bay Transportation Authority *v.* Boston Carmen's Union, Local 589.

MASSACHUSETTS BAY TRANSPORTATION AUTHORITY *vs.*
BOSTON CARMEN'S UNION, LOCAL 589, AMALGAMATED
TRANSIT UNION (and a companion case).

Suffolk. March 3, 2009. - June 4, 2009.

Present: MARSHALL, C.J., IRELAND, SPINA, COWIN, CORDY, BOTSFORD, & GANTS, JJ.

*Anti-Discrimination Law,* Employment, Handicap, Seniority. *Contract,* Collective bargaining contract. *Public Employment,* Collective bargaining. *Employment,* Discrimination. *Arbitration,* Arbitrable question, Collective bargaining, Judicial review. *Massachusetts Bay Transportation Authority. Public Policy.*

An arbitrator did not exceed her powers under G. L. c. 150C, § 11 (*a*) (3), by hearing a grievance filed by a union against the Massachusetts Bay Transportation Authority (MBTA), in which the union alleged a violation of a collective bargaining agreement (agreement) arising from the MBTA's grant of retroactive seniority and the corresponding hourly wage to a handicapped employee as part of a settlement agreement in a failure-to-hire employment discrimination matter, as matters such as seniority and wages were among those that both the Legislature and the agreement had identified as proper subjects of collective bargaining, and did not fall within the MBTA's inherent management rights [23-25]; however, the well-defined and dominant public policy against handicap discrimination, as set forth in G. L. c. 151B, required that the arbitrator's award in favor of the union be vacated, as the most meaningful remedy for such discrimination in hiring was retroactive seniority, even in the absence of an adjudication of discrimination, where, as here, the MBTA satisfied its burden of showing a substantial and reliable basis to believe that illegal discrimination had occurred, a showing that the union failed to rebut [25-30].

An arbitrator correctly concluded that a dispute arising from the actions of the Massachusetts Bay Transportation Authority (MBTA) in unilaterally eliminating a "spare inspector" list (from which certain bus drivers were given opportunities to work temporarily in a higher job classification based on seniority) and creating a new list without union consent was arbitrable [34-35]; further, a Superior Court judge correctly confirmed the arbitrator's award, which ruled that the MBTA had violated the terms of the union's collective bargaining agreement, where, although there was no suggestion of bad faith on the part of the MBTA, there was no factual basis to support the MBTA's concern that the list might be based on a discriminatory practice [35-36].

CIVIL ACTIONS commenced in the Superior Court Department on February 27 and July 31, 2006.

After consolidation, the cases were heard by *Diane M. Kott-myer,* J., on motions for summary judgment.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Mary Jo Harris* (*Philip G. Boyle* with her) for the plaintiff.

*Douglas Taylor* for the defendant.

SPINA, J. The Massachusetts Bay Transportation Authority (MBTA) appeals from judgments of the Superior Court confirming two separate awards by the same arbitrator in cases that were consolidated by virtue of a common issue, namely, whether an arbitrator's decision must be vacated on the ground that it violates public policy, where the arbitrator found against an employer who acted to remediate its own perceived illegal discrimination, but contrary to the terms of a collective bargaining agreement.

In the first case (Wick), the MBTA settled a handicap discrimination case (refusal to hire) without consent of the Boston Carmen's Union, Local 589, Amalgamated Transit Union (union), after a finding of probable cause by an investigating commissioner of the Massachusetts Commission Against Discrimination (MCAD). The settlement included a payment to William Wick, the claimant, in the amount of $16,000, a grant to Wick of seniority under the collective bargaining agreement that was retroactive to the date he was first offered the job, and the grant of a rate of pay under the collective bargaining agreement at the top of the progressive pay scale based on months of service. The arbitrator concluded that the grant of retroactive seniority and the corresponding hourly wage violated the collective bargaining agreement, and because there had been no finding of discrimination by the MCAD, the settlement was a "private" agreement that must yield to the collective bargaining agreement. She found against the MBTA, and the Superior Court judge confirmed the decision of the arbitrator. We conclude that a presumption of legitimacy arose from the settlement agreement that the union did not rebut by showing that the settlement was an attempt to subvert the collective bargaining agreement, and that because retroactive seniority is a presumptive remedy for discrimination in hiring, public policy requires the arbitrator's award be vacated.

In the second case, the MBTA, concerned that its "spare

inspector" list (from which certain bus operators were given opportunities to work temporarily in a higher job classification based on seniority) might be based on a discriminatory practice, unilaterally eliminated the list and created a new list without union consent. Although there was no suggestion of bad faith, the arbitrator found there was no factual basis to support the MBTA's concern of discrimination, and concluded the MBTA violated the collective bargaining agreement. We affirm the judgment in that case.

I

*The Case of William Wick*

The facts are not in dispute. In 1999, William Wick applied to the MBTA for a position as rail repairer. On December 18, 1999, he was offered a position on condition that he pass a physical examination. Wick wears hearing aids, but the test was conducted without allowing him to use his hearing aids. On February 19, 2000, the MBTA notified Wick that he failed the hearing test and it withdrew the offer of employment.

Wick filed a complaint with the MCAD in which he alleged discrimination (refusal to hire) based on his handicap, in violation of G. L. c. 151B, § 4 (16). In particular he alleged that he should have been accommodated by the reasonable measure of allowing him to wear his hearing aids at work. On January 13, 2001, an investigating commissioner with the MCAD found probable cause and scheduled a settlement conference. The matter did not settle and the case proceeded. On June 24, 2004, the MBTA and Wick entered into a settlement agreement whereby, in exchange for a general release, the MBTA would employ Wick as a rail repairer at the top hourly rate with seniority retroactive to December 18, 1999, the date of the MBTA's initial offer of employment. The MBTA also agreed to pay him $16,000. The MBTA made no admission of discrimination. Wick commenced work as a rail repairer on July 1, 2004. The union had not been informed of the settlement negotiations and did not approve the settlement.[1]

---

[1] In its brief the union explains that William Wick was not entitled to its representation unless and until he was an employee of the Massachusetts Bay Transportation Authority (MBTA).

The union filed a grievance on behalf of an employee who lost a bid for a posted vacancy on the day shift to Wick, asserting that the employee had greater seniority than Wick. The union claimed that in the absence of a finding of discrimination or its consent, the MBTA did not have the right unilaterally to set wages and seniority of new employees, and Wick in particular, contrary to the terms of the collective bargaining agreement. Section 516 of the collective bargaining agreement provides that seniority ratings would be established when an employee first enters a classification, e.g., rail repairer, and that employees newly entering a classification would start at the bottom of the list. Section 601 of the collective bargaining agreement establishes a progressive pay scale based on months of actual service. The MBTA rejected the grievance and the union proceeded to arbitration under the terms of the collective bargaining agreement.

The union sought an order prohibiting the MBTA generally from negotiating with any individual or group to establish terms and conditions of employment without the consent of the union, even in the context of a civil rights complaint against the MBTA. The union further sought readjustment of Wick's seniority to August, 2004, when he actually entered the department and was classified as a rail repairer, so that he would not have seniority rights greater than employees who actually worked longer than Wick. It also sought retroactive pay adjustments for fellow bargaining unit members subject to wage progression under the collective bargaining agreement between August, 2004, and August, 2006, amounting to the difference between their actual pay and the pay they would have received if their hourly rate had been at the top rate for rail repairers.

The MBTA argued before the arbitrator that the grievance is not arbitrable because the MBTA has unfettered discretion under G. L. c. 161A, § 25,[2] to set terms and conditions of compensation and seniority for new employees. Alternatively, the MBTA

---

[2]General Laws c. 161A, § 25, states in relevant part:

"The directors [of the MBTA] shall have authority to bargain collectively with labor organizations representing employees of the [MBTA] and to enter into agreements, with such organizations relative to wages, salaries, hours, working conditions, the assignment of work schedules and work locations on the basis of seniority, including: (*a*) hours of

argued that it did not violate the collective bargaining agreement by hiring Wick under the terms of the settlement agreement because, under § 102 of the agreement, the MBTA has "the exclusive right . . . to manage its business in the light of experience, good business judgment and changing conditions." The MBTA asserted it thus had the right to end the litigation and settle with Wick in a way that minimized its losses and made him "whole" for an alleged discriminatory failure to hire him in December, 1999, namely, give him the seniority status and the rate of pay that he would have attained had he been hired at that time. The MBTA further argued that public policy against discrimination, set forth in G. L. c. 151B, required this result.

The arbitrator concluded that the case was arbitrable because the dispute involved issues of seniority and wages, which are not management prerogatives. She also rejected the MBTA's public policy argument, ruling that absent an adjudication of discrimination the MBTA was obligated to set Wick's compensation and seniority conformably with the terms of the collective bargaining agreement as of the date he actually commenced work. She reasoned that because Wick's discrimination complaint was settled by private agreement he must be regarded as having no greater rights than any other individuals that the MBTA might have hired; and that when the MBTA settled Wick's case it could have compensated Wick for its mistake in ways other than granting him rights under the collective bargaining agreement to which he was not entitled. The Superior Court judge agreed with the arbitrator's analysis, determined that the award did not violate public policy, and confirmed the award.

*Discussion.* The MBTA first contends that, because it has the exclusive and inherent management right to "appoint[] and

work each day and days worked each week; provided, however, that a change in such assignment shall not provide for a change in classification; and (*b*) the filling of vacancies by promotion or transfer of qualified applicants on the basis of seniority, health benefits, pensions and retirement allowances of such employees; *provided, however, that the directors shall have no authority to bargain collectively and shall have no authority to enter into collective bargaining agreements with respect to matters of inherent management right which shall include the right: (i) to direct, appoint, and employ officers, agents and employees and to determine the standards therefor . . ."* (emphasis added).

employ . . . employees and to determine the standards therefor" under G. L. c. 161A, § 25, this matter is not arbitrable. See G. L. c. 150C, § 11 (*a*) (3) (arbitrator's award may be vacated if she "exceeded [her] powers or rendered an award requiring a person to commit an act or engage in conduct prohibited by state or federal law"); *School Comm. of Hanover* v. *Curry*, 369 Mass. 683 (1976). The union acknowledges in section 102 of the collective bargaining agreement that the MBTA has the exclusive right to manage its own business. The union does not dispute that under G. L. c. 161A, § 25, the MBTA may employ whom it pleases, or that it may set employment standards. Cf. *School Comm. of Holbrook* v. *Holbrook Educ. Ass'n*, 395 Mass. 651, 652, 655 (1985) ("G. L. c. 71, § 38 . . . provides school committees with exclusive authority to determine the qualifications of teachers"). Rather, the union argues that seniority and wages are matters for collective bargaining, they are covered in the collective bargaining agreement, and the MBTA unilaterally may not set the wages and seniority of new employees.

There are two distinct issues before us. The first is whether the arbitrator "exceeded [her] powers" under G. L. c. 150C, § 11 (*a*) (3), by intruding on a nondelegable authority of the MBTA. See *School Comm. of Southbridge* v. *Brown*, 375 Mass. 502, 505-506 (1978). The second is whether arbitration of this dispute was contemplated by the collective bargaining agreement. *Id.* at 504. These are questions for a court to decide. *Id.* at 504, 506. We answer the first question in the negative, and the second in the affirmative.

"[W]ages, salaries, hours, working conditions, the assignment of work schedules and work locations on the basis of seniority" are matters that the Legislature has identified as proper subjects of collective bargaining between the MBTA and the union. G. L. c. 161A, § 25. By implication, these matters do not fall within the MBTA's inherent management rights. See *School Comm. of Braintree* v. *Raymond*, 369 Mass. 686, 690-691 (1976); *Lynn* v. *Council 93, Am. Fed'n of State, County, & Mun. Employees, Local 193*, 51 Mass. App. Ct. 905, 906 (2001). The first question was not beyond the powers of the arbitrator.

Section 516 of the collective bargaining agreement expressly states: "Seniority shall be measured . . . upon first entering a

classification . . . [and shall] start at the bottom of the respective lists." In addition, the progressive pay schedule in § 601 of the collective bargaining agreement requires employees to be paid initially at the lowest level of pay agreed on, with specified pay increases to be received based on the number of months actually worked. Section 100 of the collective bargaining agreement provides for arbitration of disputes over matters covered by that agreement, which includes disputes over seniority and wages. The second question was not beyond the powers of the arbitrator. Whether the MBTA conferred seniority status on Wick and agreed to pay him a starting hourly rate contrary to the terms of the collective bargaining agreement is distinct from the question of employment standards, and it constitutes a classic labor dispute that is arbitrable. See *School Comm. of Holbrook* v. *Holbrook Educ. Ass'n, supra* at 657.

The arbitrator next ruled that the MBTA violated the terms of the collective bargaining agreement when it gave Wick seniority retroactive to the date of its initial offer of employment, together with a corresponding hourly rate of pay, without the consent of the union. "[W]e are strictly bound by the arbitrator's factual findings and conclusions of law, even if they are in error." *School Comm. of Pittsfield* v. *United Educators of Pittsfield*, 438 Mass. 753, 758 (2003).

The MBTA argues that the arbitrator's award must be vacated because it violates public policy. Specifically, the MBTA argues that the award requires the MBTA to continue the effects of a likely discriminatory practice in violation of G. L. c. 151B, § 4 (16), which proscribes handicap discrimination in employment. Although arbitration, particularly of labor disputes, is strongly favored in the Commonwealth as a matter of public policy, see *School Comm. of Pittsfield* v. *United Educators of Pittsfield, supra* at 758, an arbitral award must be vacated on proof of one of the grounds enumerated in G. L. c. 150C, § 11. *Id.* Section 11 (*a*) (3) requires the Superior Court to vacate the award of an arbitrator that "exceeded [her] powers or . . . requires a person to commit an act or engage in conduct prohibited by state or federal law." An award that violates public policy is such an award. See *Massachusetts Highway Dep't* v. *American Fed'n of State, County & Mun. Employees, Council 93*, 420 Mass. 13,

16 (1995). "[T]he question of public policy is ultimately one for resolution by the courts." *Id.* at 16 n.5, quoting *W.R. Grace & Co.* v. *Local Union 759, Int'l Union of the United Rubber, Cork, Linoleum & Plastic Workers*, 461 U.S. 757, 766 (1983) (*W.R. Grace*).

Before an arbitral award may be vacated as violating public policy, the policy must be shown to be "well defined and dominant, and is to be ascertained 'by reference to the laws and legal precedents and not from general considerations of supposed public interests.' " *W.R. Grace, supra,* quoting *Muschany* v. *United States*, 324 U.S. 49, 66 (1945). That analysis has been adopted in our Commonwealth. See *Massachusetts Highway Dep't* v. *American Fed'n of State, County & Mun. Employees, Council 93, supra.*

The public policy in this case is "well defined and dominant." It is the overriding governmental policy proscribing various types of discrimination, set forth in G. L. c. 151B. General Laws c. 151B, § 9, states: "This chapter shall be construed *liberally* for the accomplishment of its purposes, and *any law* inconsistent with any provision of this chapter *shall not apply* . . ." (emphasis added). The specific antidiscriminatory policy involved in this case is set forth in G. L. c. 151B, § 4 (16), which states: "It shall be an unlawful practice: . . . (16) For any employer . . . to dismiss from employment or refuse to hire . . . or otherwise discriminate against, because of his handicap, any person alleging to be a qualified handicapped person, capable of performing the essential functions of the position involved with reasonable accommodation, unless the employer can demonstrate that the accommodation required to be made to the physical or mental limitations of the person would impose an undue hardship to the employer's business."

The most meaningful remedy for discrimination in hiring is retroactive seniority. It is designed to make the injured person whole, or put him in nearly the same position he would have enjoyed if he had not been rejected from employment for discriminatory reasons. "Without an award of seniority dating from the time when he was discriminatorily refused employment, an individual . . . will never obtain his rightful place in the hierarchy of seniority according to which . . . various employment benefits

are distributed." *Franks* v. *Bowman Transp. Co.*, 424 U.S. 747, 767-768 (1976). See *id.* at 763-766. Retroactive seniority is presumptively awarded in Title VII cases. *Id.* at 775 n.34, 779 n.41. See *Zipes* v. *Trans World Airlines, Inc.*, 455 U.S. 385, 399 (1982) (District Court may award retroactive seniority to discriminated class members in Title VII suit over objection of "innocent" union not been found guilty of discrimination). There is no reason to treat cases under G. L. c. 151B differently, and neither the union, the arbitrator, nor the judge suggested otherwise.

The MBTA contends that the grant of retroactive seniority and the corresponding hourly wage in the settlement agreement was necessary to make Wick whole. The union acknowledges that a court or the MCAD could have ordered retroactive seniority as a remedy, but only if there had been a finding that the MBTA discriminated against Wick. See G. L. c. 151B, § 5, second par. (MCAD may order "such affirmative action . . . as, in the judgment of the [MCAD], will effectuate the purposes of this chapter"); Heraty *vs.* Atlas Oil Co., MCAD No. 86-BEM-0123 (1994); Moreau *vs.* Haverhill, MCAD No. 88-BEM-0966 (1993). Cf. *Franks* v. *Bowman Transp. Co.*, *supra* at 762-770 (retroactive seniority available remedy under § 706[g] of Title VII of Civil Rights Act of 1964). The focus of the union's argument, and the centerpiece of the decisions of the arbitrator and the Superior Court judge, is the absence of an adjudication of discrimination, without which, they maintain, the public policy exception does not apply.

Although neither a finding nor an admission of discrimination was made here, the union has cited no case that holds either must be made before the terms of a collective bargaining agreement must yield. Nor has it cited any authority for its claim that settlement of an individual complaint, as here, requires the approval of the tribunal before whom the discrimination complaint is pending as a precondition to overriding the terms of a collective bargaining agreement. An adjudication of discrimination and a tribunal's order for retroactive seniority may indeed be outcome determinative, but they are not necessary. In certain circumstances, which exist here, a settlement may suffice to reliably and substantially establish a violation of the law proscribing discrimination that an arbitrator may not ignore.

In *Vulcan Soc'y of the N.Y. City Fire Dep't, Inc.* v. *City of N.Y.*, 96 F.R.D. 626 (S.D.N.Y. 1983), the court held that settlement of an employment discrimination class action that included a grant of retroactive seniority did not require approval of an "innocent" union, an adjudication of discrimination, or an express admission of discrimination in order to be approved. *Id.* at 630. The negotiated settlement in that case, rather than a court-imposed decree, was deemed "something that carries with it a strong presumption of legitimacy" with respect to what a judge must consider when approving settlement of a class action. *Id.* at 629. A requirement that an employer proceed to trial simply to obtain a finding of discrimination is irresponsible. To hold otherwise would "force the employer to walk a 'high tightrope without a net.' " *Id.* at 630, quoting *Weber* v. *Kaiser Aluminum & Chem. Corp.*, 563 F.2d 216, 230 (5th Cir. 1977) (Wisdom, J., dissenting).[3] It also would violate the strong public policy that favors settlement of discrimination cases. See G. L. c. 151B, § 5, second par. (on determination of probable cause "commissioner [of the MCAD] . . . shall . . . endeavor to eliminate the unlawful practice complained of . . . by conference, conciliation and persuasion"). See also *W.R. Grace & Co.* v. *Local Union 759, Int'l Union of*

---

[3]There are other policies at play in this case. One is the inherent right of the MBTA to conduct its business, with the exception of certain matters that may be the subject of collective bargaining. See G. L. c. 161A, § 25. Another is the public policy favoring settlement of disputes. See *Cabot Corp.* v. *AVX Corp.*, 448 Mass. 629, 638 (2007); *EEOC* v. *Astra U.S.A., Inc.*, 94 F.3d 738, 744 (1st Cir. 1996) (public policy favors settlement of employment discrimination claims). The MBTA had the inherent and exclusive management right to minimize, or at least control, its potential losses, which included back pay, attorney's fees and costs, multiple and punitive damages, and civil penalties, see G. L. c. 151B, § 5, second and third pars.; § 9, second and third pars., and the cost of a known settlement at no risk. Although the union contends it should have been afforded an opportunity to participate in settlement negotiations, it was the MBTA's exclusive prerogative to fashion a settlement, and the Legislature expressly forbids the MBTA from negotiating with unions over its inherent management rights. See G. L. c. 161A, § 25. Moreover, there was no assurance that the union would not have taken a position contrary to the settlement reached in Wick's case, or *any* settlement. The union's interest, which might not have been conducive to settlement, included leveraging rejection of the MBTA's position to reopen negotiations with a view toward obtaining a more favorable financial package for its members, an observation made by the arbitrator. Its participation was neither necessary nor appropriate to settle Wick's claim.

*the United Rubber, Cork, Linoleum & Plastic Workers*, 461 U.S. 757, 770-771 (1983) ("Congress intended cooperation and conciliation to be the preferred means of enforcing Title VII").

The MBTA rested its public policy claim on the settlement agreement and the procedural history of the case that preceded settlement. There was no need to litigate the facts of Wick's case at arbitration because, as in *Vulcan Soc'y of the N.Y. City Fire Dep't, Inc.* v. *City of N.Y.*, *supra*, there was a substantial basis to believe that Wick had suffered illegal discrimination. See *id.* at 630 ("high possibility" of discrimination). The facts alleged by Wick are simple, straightforward, and compelling. See *Dahill* v. *Police Dep't of Boston*, 434 Mass. 233 (2001). The investigating commissioner found probable cause, a fact that we consider as an independent evaluation that Wick's case was serious and that it had heft, even if Wick ultimately might not have prevailed. The settlement contains the component that is awarded presumptively after a finding of discrimination in hiring, namely, retroactive seniority, which ordinarily would not have been included unless Wick presented a strong case of unlawful discrimination. The settlement also requires the MBTA to pay a sum of money that is no mere trifle or token amount. A public entity[4] would not likely have entered into such a settlement unless there was a substantial basis to believe Wick would have prevailed. The terms of settlement and the litigation context in which they occur reflect the clear and overriding legislative policy against discrimination. They provide substantial and reliable basis to believe Wick suffered a violation of the antidiscrimination laws.

The presumption of legitimacy of the settlement satisfied the MBTA's burden to show that a violation of Wick's civil rights probably occurred and that retroactive seniority was required in Wick's case. This shifted the burden to the union to show that the settlement between MBTA and Wick was a sham, that is, that the MBTA and Wick colluded to subvert the collective bargaining agreement. The union does not argue that Wick was not handicapped or that he is not capable of performing the essential functions of his job with the reasonable accommodation of the use of hearing aids. There is no question that the MBTA withdrew its

---

[4]The MBTA is a political subdivision of the Commonwealth. See G. L. c. 161A, § 2.

30                                             454 Mass. 19 (2009)

Massachusetts Bay Transportation Authority *v.* Boston Carmen's Union, Local 589.

employment offer to Wick because he failed the hearing test. Where the settlement is presumptively legitimate, and where the union has not shown that the settlement was a sham and in derogation of the collective bargaining agreement, public policy required the collective bargaining agreement[5] to yield to Wick's settlement agreement. The arbitrator's decision to the contrary effectively perpetuates the MBTA's likely discriminatory conduct and it effectively deprives Wick of the remedy to which he is entitled: retroactive seniority. It therefore violates public policy. The matter must be remanded to the Superior Court for entry of an order vacating the decision of the arbitrator in case no. SUCV2006-03218.

## II

### *The Spare Inspectors Case*

There is a classification of employees at the MBTA known as "inspectors." Some inspectors work in bus services, and others work in train services. This case concerns bus services. The duties of those who work in bus services include monitoring attendance of bus operators, directing their activities, monitoring efficiency of bus service, and responding to emergencies. It is a permanent position, and inspectors are in a bargaining unit represented by Local 600 of the Office of Professional Employees International Union, AFL-CIO.

---

[5]We note that the settlement had only a minimal impact on the union members entitled to the benefit of the collective bargaining agreement. It essentially gave Wick what he would have been entitled to receive had he not been impermissibly denied employment because of his handicap. If Wick had been hired on December 18, 1999, he would have been senior to employees hired after that date. In that respect he displaced no one's seniority. To the contrary, union members hired after December 18, 1999, may be viewed as having benefited from the discrimination he suffered. See *Patterson* v. *Newspaper & Mail Deliverers' Union of N.Y. & Vicinity*, 514 F.2d 767, 775 (2d Cir. 1975). The settlement reasonably put him in his rightful place among union members. See *Franks* v. *Bowman Transp. Co.*, 424 U.S. 747, 768, 775 (1976). We also note that the settlement did not improperly alter the terms of the collective bargaining agreement. See *W.R. Grace & Co.* v. *Local Union 759, Int'l Union of the United Rubber, Cork, Linoleum, & Plastic Workers*, 461 U.S. 757, 771 (1983). Finally, there has been no showing that the result in this case would create an "unusual adverse impact" on other union members. See Bockman *vs.* Lucky Stores, Inc., U.S. Dist. Ct., No. CIV S83-039 RAR (E.D. Cal. Aug. 11, 1986), citing *Romasanta* v. *United Air Lines, Inc.*, 717 F.2d 1140 (7th Cir. 1983), cert. denied sub nom. *McDonald* v. *United Air Lines, Inc.*, 466 U.S. 944 (1984).

The back-up system for absent inspectors is the classification of "spare inspectors." The spare inspectors classification is not a full-time or permanent position. Spare inspectors in bus services typically hold the permanent position of bus operator. Individuals who have passed a written examination and otherwise qualify for the spare inspectors position based on job performance, disciplinary records, and safety records are given a "ranking" by the MBTA and their names are placed on a spare inspectors list (master list) by date of qualification. A master list was formally adopted on February 16, 2001, in a settlement of litigation between the MBTA and the union. It was not the first such list. The February 16, 2001, master list has both "ranking" and seniority features for which the MBTA aggressively negotiated and litigated.

The spare inspectors are represented by the Boston Carmen's Union, Local 589, Amalgamated Transit Union (union). When Local 600 inspectors are absent or otherwise unavailable, the MBTA assigns spare inspectors by seniority to fill in at the garage where the temporary vacancy exists. Each garage keeps its own list of spare inspectors, in rank order and seniority for that specific garage, based on the master list. The pay for work as spare inspector is higher than the pay for bus operator. An assignment as spare inspector is coveted. Moreover, whenever permanent vacancies occur in the position of inspector, appointments routinely are made from the list of spare inspectors kept by the affected garage, in order of rank and seniority.

As of March, 2004, there were seventy-three names on the master list in bus services, and the MBTA decided to increase the size of the list. An examination had not been given since 2000, and the MBTA posted a notice of its intention to create a new list. One legal consultant for the MBTA was concerned that its past use of discipline as one factor in making placements on the list had adversely affected women and minority bus operators disproportionately, and might be viewed negatively under the MBTA equal employment opportunity compliance program (compliance program), which we discuss later. Consequently, the MBTA decided to eliminate the February 16, 2001, master list and create a new list. In addition, it selected thirty-one union members from the original list and retained them on the new

master list, by garage.[6] The forty-two union members who were removed from the list were notified that they would have to reapply and take the written test. As a result, a number of them lost seniority to some of the thirty-one who were retained and placed on the new list. The new list was implemented in September, 2004. The union filed a grievance, which was denied. The matter proceeded to arbitration.

The MBTA argued that the dispute was not arbitrable. It claimed the February 16, 2001, master list had "expired," and that because it had the inherent management right to assign, employ, and appoint employees, and to determine the standards for employment, it had the unfettered right to create a new list. See G. L. c. 161A, § 25. It also relied on § 127 of the collective bargaining agreement, which contains an acknowledgment of the MBTA's inherent management rights pursuant to G. L. c. 161A, § 25, and a statement that the MBTA "shall retain complete discretion without regard to seniority to qualify, rank and appoint individuals to the following positions: . . . Spare Chief Inspector, Spare Inspector."

The MBTA also relied on its past involvement in a 1997 agreement between the MBTA, various unions (including Local 589), and the Attorney General in what has been described as the compliance program. The compliance program identified measures required to be taken by the MBTA to implement policies of non-discrimination and to foster an environment of equal and fair treatment in the daily operations of the MBTA as remediation for past practices that were highly questionable or outright discriminatory. The compliance program was designed to self-terminate after three years, in February, 2000, unless the Attorney General notified the MBTA in writing not less than sixty days in advance of the termination date, setting forth reasons with particularity why it would not terminate, in which case the compliance program would be extended for an additional two years. Thereafter, if the Attorney General determined that the MBTA was not in material compliance with the terms of the compliance program, it would remain in full force and effect until such time as material compliance was achieved.

By letter dated December 20, 1999, the Attorney General

---

[6]This created a separate seniority problem that we need not address.

extended the compliance program two years. In January, 2002, the MBTA and the Attorney General entered into a new agreement allowing the Attorney General additional time to review and determine whether the MBTA achieved material compliance under the compliance program. In August, 2002, the Attorney General notified the MBTA that it was not currently in material compliance and he outlined the areas of noncompliance and corrective measures to be taken. On September 15, 2005, the Attorney General agreed that the MBTA effectively had addressed all areas of noncompliance, and the compliance program was terminated. The MBTA had argued during arbitration, which took place over three days between May 4 and October 5, 2005, that its decision with regard to elimination of the master list was compelled by the compliance program.

The arbitrator rejected the MBTA's claim that the dispute was not arbitrable. She concluded that the MBTA may have had the inherent right to appoint employees as spare inspectors and place their names on the master list, but having done that, it had no right to remove their names from the list.

Section 219 of the collective bargaining agreement states:

"Seniority Rating — Bus Operations

"Seniority shall be measured — i.e., ratings established — in accordance with the following rules and procedures:

"A. Employees establish a rating date upon first entering a classification . . . . The rating date in that classification is permanently held under the following circumstances: a) upon transfer or promotion into a full time classification within the department, including Spare Inspector . . . .

"B. In the event that more than one employee establishes a rating on the same date, seniority order will be determined by date of first entering a full time classification. In those cases where a list of eligible appointees is created following specialized qualification (for example, including a test or examination) the seniority date of these employees will be determined by the [MBTA's] ranking of them."

She also rejected the MBTA's claim that the February 16,

2001, master list was to last only two years. She noted that historically new additions to earlier master lists were appended to whatever remained of a prior list.

The arbitrator concluded there was "no real evidence on the record to support [the MBTA's] claim" that the master list could be found to have been created under discriminatory circumstances. She rejected the MBTA's assertion that it was compelled by the demands of the compliance program to act as it did in March, 2004, with respect to the master list. She found that the February 16, 2001, master list itself was developed in response to and during the compliance program, and the Attorney General had issued no directive to eliminate that master list. She found that there was no showing that any employee was excluded or had complained about being excluded or improperly ranked on that master list. She also found there was no evidence that the test that was administered in 2000 for the February 16, 2001, master list produced an invalid result, and that the test that was administered in 2004 for the new list did not produce qualitatively different results. The arbitrator specifically found that the compliance program neither required nor justified the actions of the MBTA as to the February 16, 2001, master list.

The arbitrator concluded that the MBTA violated the terms of the collective bargaining agreement by eliminating the master list adopted on February 16, 2001, thereby stripping some union members of the seniority to which they were entitled under the collective bargaining agreement. She ordered the MBTA to reconstitute that master list, as well as other remedies we need not address. A Superior Court judge confirmed the award.

*Discussion.* The arbitrator correctly concluded that the dispute was arbitrable. As in the Wick matter, *supra*, there is no dispute over the inherent management right of the MBTA to "appoint[] and employ . . . employees and to determine the standards" for employment. G. L. c. 161A, § 25. However, once appointed, the employees whose names appeared on the master list acquired seniority rights under the terms of the collective bargaining agreement that are recognized and protected by the statute. *Id.* The MBTA did not have the inherent management right to strip those employees of their seniority rights by eliminating the

existing master list and creating a new list. See *School Comm. of Holbrook* v. *Holbrook Educ. Ass'n*, 395 Mass. 651, 652, 655 (1985); *School Comm. of Braintree* v. *Raymond*, 369 Mass. 686 (1976); *Lynn* v. *Council 93, Am. Fed'n of State, County, & Mun. Employees, Local 193*, 51 Mass. App. Ct. 905, 906 (2001).

The arbitrator next ruled that the MBTA violated the terms of the collective bargaining agreement. Section 219 of the collective bargaining agreement expressly gives spare inspectors seniority rights, a matter that the Legislature has said is a proper subject for collective bargaining between the MBTA and the union. See G. L. c. 161A, § 25. When the MBTA unilaterally eliminated the February 16, 2001, master list and placed selected names on the new master list it deprived union members of seniority status to which they were entitled under the agreement. We are bound by that determination. See *School Comm. of Pittsfield* v. *United Educators of Pittsfield*, 438 Mass. 753, 758 (2003).

We turn to the public policy question. The Legislature has determined that discrimination against employees on the basis of race, national origin, or sex, as well as other features not applicable here, is illegal. See G. L. c. 151B, § 4 (1).[7] This is a well-defined and dominant policy, see G. L. c. 151B, § 9, and it proscribes the use of promotional practices that discriminate against women and minorities.

Although the MBTA was free to alter or modify the criteria it used to appoint persons to the spare inspector master list, as it alone determined, once the appointment was made, seniority status attached and the MBTA could not unilaterally strip employees of that status. The appropriate procedure would have been to enter negotiations with the union to remedy what the MBTA claims were improper appointments. Failing that, a unilateral attempt to override the terms of the collective bargaining agreement under the public policy exception required the MBTA to prove in arbitration that it had used criteria in making appoint-

[7]General Laws c. 151B, § 4 (1), states in part: "It shall be an unlawful practice: '(1) For an employer . . . because of the race, color, . . . national origin, sex, . . . or ancestry of any individual . . . to discriminate against such individual in compensation or in terms, conditions or privileges of employment . . . .' "

ments to the spare inspector list that violated G. L. c. 151B, § 4 (1). Had the MBTA proved its case, the arbitrator would have been required, as a matter of public policy, to rule in favor of the MBTA. Her failure to so rule itself would have constituted a violation of public policy, and her award would have to be vacated under the public policy exception. See *Massachusetts Highway Dep't* v. *American Fed'n of State, County, & Mun. Employees Council 93*, 420 Mass. 13, 16 (1995).

Unlike the Wick matter, no one had come forward with a claim of discrimination, and no claim of discrimination had been brought before an administrative tribunal or a court that resulted either in a finding of discrimination or a settlement that was presumptively legitimate and not shown (in arbitration) to be a sham. Here, the entire matter was litigated before the arbitrator and the MBTA failed to convince the arbitrator that it had discriminated against any employee when it made appointments to the February 16, 2001, master list. "[W]e are strictly bound by the arbitrator's factual findings and conclusions of law," absent proof of one of the grounds enumerated in G. L. c. 150C, § 11. *School Comm. of Pittsfield* v. *United Educators of Pittsfield, supra.* The Superior Court judge correctly confirmed the arbitrator's award.

### III

### Conclusion

These cases are remanded to the Superior Court where an order vacating the decision of the arbitrator is to enter in case no. SUCV2006-03218. The order confirming the decision of the arbitrator in case no. SUCV2006-00833 is hereby affirmed.

*So ordered.*