## School Committee of Chicopee *vs.* Chicopee Education Association.

No. 10-P-387.

Hampden. November 8, 2010. - September 8, 2011.

Present: Berry, Smith, & Green, JJ.

*School and School Committee,* Arbitration, Termination of employment. *Arbitration,* School committee, Vacating award, Authority of arbitrator, Collective bargaining. *Contract,* Collective bargaining, Arbitration. *Labor,* Collective bargaining, Arbitration. *Public Employment,* Collective bargaining.

In a civil action challenging the decision of an arbitrator reinstating to his former position a teacher who had been terminated for improper use of a sick day and insubordinate conduct, the judge erred in confirming the arbitration award, where the arbitrator exceeded the authority provided to him under G. L. c. 71, § 42, and improperly crafted his decision and award entirely from the assumption that the parties' collective bargaining agreement controlled. [364-366]

Civil action commenced in the Superior Court Department on October 15, 2008.

The case was heard by *Peter A. Velis,* J., on motions for judgment on the pleadings.

*Gordon D. Quinn* for the plaintiff.

*Matthew D. Jones* for the defendant.

Smith, J. In June of 2007, Chicopee high school teacher Gary Sroka was terminated by the school committee of Chicopee (school committee) for improper use of a sick day and insubordinate conduct. Represented by the defendant Chicopee Education Association (association), Sroka grieved the dismissal under his union's collective bargaining agreement, and the matter proceeded to arbitration. Following a hearing, the arbitrator issued a decision reinstating Sroka to his former position. The plaintiff school committee sought to vacate the award, but a Superior Court judge denied its application and instead confirmed the

award. The school committee now appeals, arguing that the arbitrator's decision both exceeded his authority and violated public policy.

1. *Background.* The following facts, taken from the arbitrator's decision, are undisputed. Sroka began working at Chicopee high school in 2000, when the school committee hired him as a special education teacher. A few years later, he was assigned to teach social studies and history. Before the events leading to his dismissal, Sroka already had established a disciplinary history at the school for using profanity in front of students and other teachers.[1] The school was also aware that Sroka suffered from various mental health issues. During the 2004-2005 school year, he received an accommodation in his school schedule because of a diagnosis of attention deficit hyperactivity disorder. In 2005, Sroka took a leave of absence to recover from depression, and in early 2007, evidence was presented in connection with a profanity-related suspension that he suffered from anxiety.

Against this backdrop, the events leading up to Sroka's dismissal are as follows. In May, 2007, the school department of Chicopee planned to hold an "armed services career day" on May 21, 2007, mandating attendance by all high school students and teachers. Fueled by his negative feelings about the United States' involvement in the war in Iraq, and based on his belief that the event would send an inappropriate message to young and impressionable students, Sroka decided to organize a protest of it. To that end, he, his son, and some friends made protest signs and pamphlets to hand out during the event. When he arrived at school on May 21, however, Sroka noticed that the school building had been vandalized with antiwar comments. Knowing he would be a suspect, Sroka called off the protest and informed the school's principal, Roland R. Joyal, Jr., that he did not commit the vandalism but that he knew who probably did. After his conversation with Joyal, Sroka again changed his mind about the protest and, seeing that his students had already gone to the

---

[1]In 2004, Sroka was issued a written warning for raising his voice and swearing to his social studies supervisor. In 2005, he was given a three-day suspension for telling a student, "I don't want to take this attitude shit from you," and telling another student, "[Y]ou're fucking out of here," while pointing at the door. Later, in April of 2007, Sroka received another three-day suspension, reduced from five days, for uttering the word "shit" in the classroom.

event, took his protest signs and protested from the event's perimeter. At some point thereafter, Joyal noticed the protest and told Sroka to return to class. Sroka did so, but shortly thereafter he felt suddenly anxious and went home sick.

That night, Sroka called in sick for the following day. He also got in touch with his son's friend, Barry Scott, who he believed committed the vandalism. Sroka convinced Scott to turn himself in, and in a show of support, Sroka accompanied Scott to court the next day. While there, Sroka continued his protest outside the courthouse and told a reporter that "a little defacement of a public building is a lot less than the crimes being committed at Chicopee High School by trying to seduce these young children to join the military."

The following day, May 23, 2007, Sroka reported to school as usual. As the day progressed, however, Sroka began to engage in odd behavior. While monitoring a test, he posted a sign stating: "Rogue Teacher Beware." Later, when he noticed that his classroom computer was missing, he wrote his department chairperson a note stating that he believed a crime had been committed, that the police should be notified, and that "I believe an incredible 'moral' crime is about to be [committed] by the administration of [Chicopee High School]. (Know I forgive you and will pray for you all!)"

A short time later, during the school lunch break, Sroka apparently felt compelled to continue the protest. Joyal later found him walking outside, barefoot, with his pant legs partially rolled up, wearing an olive green military coat and hat, bearing a protest sign, and beating a bongo drum. When Joyal informed Sroka that it was time for him to return to teach his class, Sroka insisted, "I'm not Gary Sroka, I'm Sergeant Pepper." At that point, Joyal observed that Sroka did, indeed, appear to be dressed as a member of Sergeant Pepper's Lonely Hearts Club Band.[2] Despite several further warnings that his refusal would constitute insubordination and result in disciplinary action, Sroka continued in what he described as his "guerilla theater" efforts and headed toward the center of Chicopee. He was placed on administrative leave later the same day, and in June

---

[2] A Beatles album released in 1967, with cover art depicting the members of the band dressed in military attire.

of 2007, his employment was terminated for insubordinate conduct, improper use of a sick day, and his prior disciplinary record.

Following the May 23 incident, Sroka sought professional help and was diagnosed with bipolar II disorder. His treating psychiatrist, Dr. Bennett Gaev, reported to the school committee by letter dated June 18, 2007, that prior to their initial June 5 appointment, Sroka was "hypomanic." In deposition testimony, Dr. Gaev further opined that antidepressant medication Sroka had been taking for years to treat depression "was wrong and may have been responsible for . . . Sroka's behavior on May 22nd and May 23rd." Sroka was prescribed mood stabilizing medication to treat his disorder, and he has since reported feeling better than he has in years.

a. *The arbitration proceeding.* In March, 2008, the parties, proceeding under the grievance procedure outlined in the collective bargaining agreement between the school committee and the association, submitted the matter to arbitration. In addition to two days of hearings, the record before the arbitrator included the deposition testimony of Dr. Gaev, as well as extensive posthearing briefs. The parties focused their arguments in large part on the significance of Sroka's alleged mental disorder. The association maintained that once the school committee had notice of Sroka's mental health issues, it should have engaged in further inquiry. Thereafter, if the issues raised were determined to be valid, it could have provided an appropriate accommodation for Sroka's disability. The association argued in the alternative that the dismissal was simply too harsh a penalty for Sroka's conduct, especially if mitigated by the mental health component. The association lastly remarked that Sroka's past record should not have been considered because it was unrelated to the incidents precipitating the dismissal.

The school committee, on the other hand, argued that Sroka should be held fully accountable for his conduct. As to the sick day, it noted that Sroka indisputably was engaged in several activities, including going to the courthouse and using an online grading system, that indicated he was not, in fact, sick at that time. As to his "guerilla theater" activities and ultimate refusal to teach his class, the school committee argued that any mental

health problems suffered by Sroka had not been proven. In support of that contention, it suggested that Dr. Gaev's letters and deposition testimony were unreliable and deserved no evidentiary weight because they had been offered in an attempt to help Sroka get his job back.[3] The school committee also pointed to Dr. Gaev's only having met with Sroka for two short sessions, and his failure to take into account key elements associated with hypomanic episodes, as described in the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders (4th ed. 2000) (DSM-IV), in reaching his diagnosis of bipolar II disorder. Finally, the school committee cited previous arbitration decisions in arguing that an employee's mental health lapse may not alter a disciplinary sanction properly resulting from the conduct in question.

b. *The arbitration decision.* The arbitrator issued his decision in September, 2008. He framed the issue, as stipulated to by the parties, as follows: "Did the School Committee have just cause to discharge the grievant, Gary Sroka, in June 2007? If not what shall be the remedy?" In a footnote to the reference, the arbitrator cited to the paragraph of the agreement providing that "[n]o teacher will be disciplined . . . without just cause." The arbitrator then found that notwithstanding the medical evidence, just cause for discipline existed as to both the apparent sick leave violation and the insubordination. He nevertheless concluded that, "in line with principles of progressive discipline," the punishment imposed was not commensurate with the violations committed. In reaching that conclusion, the arbitrator noted that Sroka's disciplinary history was completely unrelated to the present offenses, and that Sroka had not been given prior warnings about this type of behavior. He further observed that the excessive level of discipline "suggests that indeed the [school committee] took offense at what it considered Sroka's embarrassing and inappropriate antics."

The arbitrator next considered the effect, if any, of the medical evidence of Sroka's diagnosis of bipolar II disorder on the outcome of the case. Discounting the evidence on the one hand, the arbitrator stated that Sroka "must face up to his wrongdoing

[3]Dr Gaev admitted in his deposition testimony that he penned a November 5, 2007, letter to enable Sroka "to get his job back."

and accept the consequences." On the other hand, and "[a]ssuming without deciding," the arbitrator observed that Sroka likely was entitled to an accommodation for his mental illness under the Americans with Disabilities Act, and that, under Massachusetts law, he could not be fired for conduct that was the result of that medical condition. In the end, the arbitrator reinstated Sroka to his former position because, "under either analysis," the discipline imposed on Sroka was too harsh.

c. *Application to vacate the award.* The school committee thereafter applied in the Superior Court pursuant to G. L. c. 150C, § 11, to vacate the award, arguing that the arbitrator exceeded his authority and that the award violated public policy. In support of its application as to the former, the school committee cited G. L. c. 71, § 42, the teacher dismissal statute, arguing that it precludes an arbitrator from performing a just cause analysis of a termination.[4]

Under G. L. c. 71, § 42, as appearing in St. 1993, c. 71, § 44, a teacher with professional status may be dismissed only for "inefficiency, incompetency, incapacity, conduct unbecoming a teacher, insubordination or failure . . . to satisfy teacher performance standards . . . or other just cause." The statute further provides that a teacher may seek review of a dismissal by arbitration, and places the burden on the school committee to prove the "just cause" that served as grounds for dismissal. In reviewing a dismissal, an arbitrator is to "consider the best interests of the pupils in the district and the need for elevation of performance standards." G. L. c. 71, § 42.[5] In accordance with that statute, the school committee claimed that once it had proven Sroka engaged in the conduct in question, the arbitrator

[4]On the basis of the record before us, we are unable to determine if the application of G. L. c. 71, § 42, was raised during the arbitration proceedings.

[5]General Laws c. 71, § 42, was enacted as part of the Education Reform Act of 1993. See *School Dist. of Beverly* v. *Geller*, 435 Mass. 223, 225 n.1 (2001) (Cordy, J., concurring). The relevant text of the statute is as follows:

"A teacher with professional teacher status, pursuant to section forty-one, shall not be dismissed except for inefficiency, incompetency, incapacity, conduct unbecoming a teacher, insubordination or failure on the part of the teacher to satisfy teacher performance standards developed pursuant to section thirty-eight of this chapter or other just cause.

"A teacher with professional teacher status may seek review of a

had no choice but to uphold the dismissal, and in reinstating Sroka, the arbitrator improperly substituted his judgment for that of the school committee.

In support of this proposition, the school committee relied heavily on Justice Cordy's concurring opinion in *School Dist. of Beverly* v. *Geller*, 435 Mass. 223, 231-232 (2001) (*Geller*). In *Geller*, the court applied the statute in the context of a teacher who had been dismissed for conduct unbecoming a teacher after the school district fielded multiple complaints that the teacher had used physical force against his sixth grade students. *Id.* at 226. The court issued a plurality opinion,[6] with Justice Cordy deciding that proper interpretation of the statute "precludes the arbitrator from conducting a further 'just cause analysis' (e.g., weighing the teacher's prior record against the misconduct for the purpose of justifying a different sanction) once he has found that one of the enumerated grounds for dismissal has been proved." *Id.* at 234. A majority of the court, however, did not agree with Justice Cordy's interpretation of the statute.

d. *The motion judge's decision.* On cross motions for judgment on the pleadings, a Superior Court judge confirmed the award. In his decision, the judge concluded that under the deferential standard applied to arbitrators' decisions, absent a showing of fraud, the arbitrator's decision in this case was indisputable. In response to the school committee's citation to *Geller* and G. L. c. 71, § 42, the judge observed that *Geller* is a plurality decision in which "more questions [are] left open than answered." He also distinguished the case on the basis of

dismissal decision within thirty days after receiving notice of his dismissal by filing a petition for arbitration with the commissioner. . . .

"At the arbitral hearing, the teacher and the school district may be represented by an attorney or other representative, present evidence, and call witnesses and the school district shall have the burden of proof. In determining whether the district has proven grounds for dismissal consistent with this section, the arbitrator shall consider the best interests of the pupils in the district and the need for elevation of performance standards."

[6]Justice Cordy's opinion was joined by Chief Justice Marshall and Justice Sosman. Justice Cowin's dissenting opinion was joined by Justice Greaney and Justice Spina. Justice Ireland concurred with Justice Cordy in result only, deciding the case on the grounds of public policy.

the underlying facts. As to public policy, the judge ruled that the school committee had failed to make out a prima facie showing because it could not point to a "defined, dominant, and visible" public policy that had been violated. The school committee timely appealed, restating the arguments it advanced before the motion judge.

2. *Discussion.* It is a well-settled principle of law that arbitration awards are subject to a narrow scope of review, and that "[a]bsent fraud, errors of law or fact are not sufficient grounds to set aside an [arbitration] award." *Plymouth-Carver Regional Sch. Dist.* v. *J. Farmer & Co.*, 407 Mass. 1006, 1007 (1990). "The strong public policy favoring arbitration requires us to uphold an arbitrator's decision even where it is wrong on the facts or the law, and whether it is wise or foolish, clear or ambiguous." *Boston* v. *Boston Police Patrolmen's Assn.*, 443 Mass. 813, 818 (2005). Consistent with the limited scope of arbitral determinations, the Supreme Judicial Court recently cautioned that a court "should not . . . undertak[e] what in effect [is] an independent, de novo evaluation of the evidence before the arbitrator." *School Comm. of Lowell* v. *Robishaw*, 456 Mass. 653, 665 n.11 (2010).

In addition to these principles of judicial review, the language of G. L. c. 71, § 42, further provides that dismissal decisions be subject to judicial review as provided in G. L. c. 150C. Pursuant to G. L. c. 150C, § 11, a judge in the Superior Court "shall vacate" an arbitrator's award on a party's application if, among other enumerated grounds, "the arbitrators exceeded their powers or rendered an award requiring a person to commit an act or engage in conduct prohibited by state or federal law." *School Comm. of Lowell* v. *Robishaw*, *supra* at 660, quoting from G. L. c. 150C, § 11.

A foundational step in any arbitration case is determining the source and limit of an arbitrator's authority. Ordinarily, the authority of an arbitrator is derived entirely from the parties' collective bargaining agreement, and is accordingly limited by the terms of that agreement. See *School Comm. of Waltham* v. *Waltham Educators Assn.*, 398 Mass. 703, 706-707 (1986); *Plymouth-Carver Regional Sch. Dist.* v. *J. Farmer & Co.*, 407 Mass. at 1007. In this case, the arbitrator and the motion judge

proceeded on the assumption that the arbitrator's authority was so derived. A majority of the court in *Geller* made clear, however, that under the circumstances of this case, those assumptions were faulty.

Before diverging in their opinion regarding the limits G. L. c. 71, § 42, places on arbitral review, Justice Cordy, in his concurring opinion, and Justice Cowin, in her dissent, each observed that § 42 serves as the source and limit of an arbitrator's authority in teacher dismissal cases, regardless of the provisions of a collective bargaining agreement. See *Geller*, 435 Mass. at 230 n.5 (Cordy, J., concurring) (notwithstanding citation to § 42 in the reference, "the parties could not properly authorize the arbitrator to act beyond his statutory authority in any event"); *id.* at 240 (Cowin, J., dissenting) ("The authority to arbitrate the dismissal of a teacher with professional teacher status is derived from statute rather than from contractual agreement"). Thus, despite the court's plurality opinion, *Geller* holds that in the context of teacher dismissal, an arbitrator may not "ignore the limits imposed by statute" and craft a decision grounded in the authority provided by a collective bargaining agreement.[7] *Ibid.* See *School Comm. of Lowell* v. *Vong Oung*, 72 Mass. App. Ct. 698, 705 (2008).

It is undisputed, and apparent from the record, that the arbitrator in this case crafted his decision and award entirely from the assumption that the parties' collective bargaining agreement controlled, and apparently unaware of the authority, standards of review, and dictates of G. L. c. 71, § 42. The statute is

---

[7]The association argues that, pursuant to G. L. c. 150E, § 8, as amended by St. 1978, c. 393, § 39, the collective bargaining agreement is, in fact, the arbitrator's source of authority. That statute provides that where elected by an employee, a collective bargaining agreement shall be the "exclusive procedure for resolving any . . . grievance involving . . . dismissal . . . or termination notwithstanding any contrary provision of . . . sections forty-two through forty-three A . . . of chapter seventy-one."

While perhaps appealing on its face, the association's argument is necessarily defeated by the Supreme Judicial Court's explicit conclusion to the contrary in *Geller*, namely that the provisions of G. L. c. 71, § 42, supersede a collective bargaining agreement, see *infra*, and "the established canon of statutory construction that 'general statutory language must yield to that which is more specific.' " *Silva* v. *Rent-A-Center, Inc.*, 454 Mass. 667, 671 (2009), quoting from *TBI, Inc.* v. *Board of Health of N. Andover*, 431 Mass. 9, 18 (2000).

mentioned nowhere in the arbitrator's decision, nor are the considerations of the "best interests of the pupils in the district and the need for elevation of performance standards." The decision is instead based entirely on the premise that the collective bargaining agreement is the source and scope of authority. Thus, unlike in *Geller*, the decision here was fatally flawed from the start, as the arbitrator never even attempted to apply § 42 review to the case. Viewing the case through the wrong lens, he necessarily exceeded the authority provided to him under the statute. We need go no further in our analysis.[8] The judgment of the Superior Court confirming the arbitration award is vacated, and a new judgment shall enter vacating the award.[9]

*So ordered.*

---

[8]Because our resolution of this case does not require us to reach the question "left open by the Supreme Judicial Court in [*Geller*]," *School Comm. of Lowell* v. *Vong Oung*, 72 Mass. App. Ct. at 705, we offer no opinion on the limits of an arbitrator's review of a dismissal decision under G. L. c. 71, § 42. We nevertheless acknowledge the difficult task that awaits an arbitrator, should this case proceed to a second arbitration, in deciphering the limits in review posed by the statute.

[9]Because we conclude that the award must be vacated, we need not review the school committee's claim that the award violated public policy.