SCHOOL COMMITTEE OF MARSHFIELD *vs.* MARSHFIELD
EDUCATION ASSOCIATION.

No. 12-P-1737.

Plymouth. October 8, 2013. - January 28, 2014.

Present: KAFKER, VUONO, & CARHART, JJ.

*Contract,* School teacher, Collective bargaining contract, Arbitration. *Public Employment,* Collective bargaining, Termination. *School and School Committee,* Collective bargaining, Termination of employment, Arbitration, Waiver. *Labor,* Public employment, Collective bargaining, Arbitration. *Arbitration,* School committee, Collective bargaining, Authority of arbitrator, Award. *Waiver. License. Public Policy.*

Discussion of the statutes and regulations governing teacher licensure and termination. [745-746]

A Superior Court judge properly confirmed an arbitration award in favor of a high school teacher, who was a member of the defendant union, where the arbitrator did not exceed her authority in concluding that, absent termination proceedings pursuant to G. L. c. 71, § 42, the teacher's employment did not cease as a matter of law when the Commissioner of Education declined to renew his teaching license and to grant the district superintendent's request for a waiver of the license requirement, and that the teacher was still an employee entitled to rights under a collective bargaining agreement, including the right to an unpaid leave of absence to fulfil the requirements necessary for licensure [754-755]; further, the award did not violate G. L. c. 71, § 38G, the teacher licensing statute, or the public policy reflected therein, given that § 38G does not in any way define the requirements for termination of employment and the associated rights of employment for those who have previously been licensed and achieved professional teacher status [752-754, 755-758].

CIVIL ACTION commenced in the Superior Court Department on October 14, 2010.

The case was heard by *Robert C. Cosgrove,* J., on motions for summary judgment.

*James A. Toomey (Tami L. Fay* with him) for the plaintiff.

*John M. Becker* for the defendant.

*Stephen J. Finnegan,* for Massachusetts Association of School Committees, Inc., amicus curiae, submitted a brief.

*Michael J. Long*, for Massachusetts Association of School Superintendents, amicus curiae, submitted a brief.

KAFKER, J. Review of the arbitration award here requires us to examine the teacher licensing and termination provisions in the Education Reform Act of 1994, St. 1993, c. 71, as well as various provisions in a collective bargaining agreement, and explain their interrelationship. Gerard O'Sullivan was employed as a teacher by the Marshfield public school district (district) for almost eight years. O'Sullivan was terminated in 2008 when the school committee of Marshfield (school committee) took the position that his employment automatically ended by operation of law when his teaching license was not renewed by the Commissioner of Education (commissioner) and the commissioner denied the district superintendent's request for a waiver of the license requirement. The school committee took no steps to terminate O'Sullivan in accordance with the terms of his teaching contract and the collective bargaining agreement (CBA) between the school committee and the Marshfield Education Association (association), to which O'Sullivan belonged. Nor did the school committee follow the teacher termination process set out in G. L. c. 71, § 42. Rather, the school committee asserted that without a license or waiver, O'Sullivan ceased to be employed as a matter of law and, as a result, was not entitled to any rights afforded a professional teacher under § 42, or under the CBA, including the one-year unpaid leave of absence O'Sullivan had requested so that he could fulfil the requirements necessary for licensure. Thereafter the association, "pursuant to the parties' collective bargaining agreement," filed a demand for arbitration.

In this unusual procedural posture, without O'Sullivan proceeding to arbitration pursuant to G. L. c. 71, § 42, and with the school committee relying exclusively on G. L. c. 71, § 38G, the teacher licensing statute, for the elimination of O'Sullivan's contractual rights, the arbitrator determined that O'Sullivan's employment did not cease as a matter of law despite the lack of a license or waiver, and that he was still an employee and entitled to the resultant contractual rights, including the one-year unpaid leave of absence he had requested. A judge of the Superior Court confirmed the arbitrator's award. On appeal, the school committee asks us to vacate the arbitrator's decision and award.

We decline and affirm the award, concluding that O'Sullivan's unlicensed status alone did not automatically eliminate his rights, and that absent termination pursuant to § 42, he retained certain collective bargaining rights, including the right to file a grievance and request an unpaid leave of absence. We also conclude that the arbitrator did not exceed her authority in deciding that O'Sullivan was entitled under the CBA to the one-year unpaid leave of absence to try to fulfil his licensing requirements. Finally, the decision was not contrary to law or in violation of public policy.

*Background.* 1. *Relevant teacher licensing and termination statutes and regulations.* The statute governing teacher licensure, G. L. c. 71, § 38G, as amended through St. 1993, c. 495, § 26, states that "[n]o person shall be eligible for employment as a teacher . . . unless he has been granted by the commissioner a provisional, or standard certificate with respect to the type of position for which he seeks employment." The statute also provides the following exception: "[A] superintendent may upon request be exempt by the commissioner for any one school year from the requirement in this section to employ certified personnel when compliance therewith would in the opinion of the commissioner constitute a great hardship in securing teachers for that school district." *Id.*

Regulations promulgated by the Board of Education, 603 Code Mass. Regs. §§ 7.03 and 7.04 (2005), further clarify the different types of licenses — preliminary, initial, and professional — and the prerequisites for each, with the preliminary being the first license that a prospective teacher can obtain, followed by the initial, and then the professional. Both the preliminary and initial licenses are valid for five years and may be renewed for an additional five years. See 603 Code Mass. Regs. § 7.02 (2005). As explained below, O'Sullivan received a five-year preliminary license, and the superintendent received two waivers allowing O'Sullivan to teach in two subsequent years, with one of those waivers applying retroactively.

General Laws c. 71, § 38G, does not address termination of a teacher. The termination process is set out in G. L. c. 71, § 42, as appearing in St. 1993, c. 71, § 44, which provides in relevant part as follows:

"A teacher who has been teaching in a school system for at least ninety calendar days shall not be dismissed unless he has been furnished with written notice of intent to dismiss and with an explanation of the grounds for the dismissal in sufficient detail to permit the teacher to respond and documents relating to the grounds for dismissal, and, if he so requests, has been given a reasonable opportunity within ten school days after receiving such written notice to review the decision with the principal or superintendent, as the case may be, and to present information pertaining to the basis for the decision and to the teacher's status. . . . Teachers without professional teacher status shall otherwise be deemed employees at will.

"A teacher with professional teacher status, pursuant to section forty-one, shall not be dismissed except for inefficiency, incompetency, incapacity, conduct unbecoming a teacher, insubordination or failure on the part of the teacher to satisfy teacher performance standards developed pursuant to section thirty-eight of this chapter or other just cause."

A teacher "who has served in the public schools of a school district for the three previous consecutive school years shall be considered a teacher, and shall be entitled to professional teacher status as provided in [§ 42]." G. L. c. 71, § 41, as amended by St. 1996, c. 99. As explained *infra*, O'Sullivan had achieved professional teacher status. There was no attempt by the superintendent to terminate him pursuant to § 42.

Section 42 of G. L. c. 71 further provides that a teacher may seek review of a dismissal decision through arbitration. With respect to the arbitrator's decision, the statute states that "[u]pon a finding that the dismissal was improper under the standards set forth in this section, the arbitrator may award back pay, benefits, reinstatement, and any other appropriate non-financial relief or any combination thereof." G. L. c. 71, § 42. The arbitration here was not undertaken pursuant to § 42 but, rather, pursuant to the CBA.

2. *Relevant CBA provisions.* The CBA, in place between 2007 and 2010, also contains a number of relevant provisions. Regarding the contracts between the school district and its

teachers, the CBA contains both a teacher's initial contract and a long-term contract.[1]

The long-term contract, which governs the relationship between the school district and teachers with professional teacher status, provides that the contract "shall continue in force from year to year." The long-term contract also provides that "[e]mployment may be terminated by mutual consent at any time," that the "teacher may resign for good reason" as long as certain requirements are met, and that "[t]he Superintendent/Principal may suspend said teacher or terminate this contract at any time for cause as provided in the General Laws of the Commonwealth of Massachusetts, particularly, Massachusetts General Law Chapter 71, Section 42 and/or 42D, as said laws may be amended from time to time."

Article 12.7 of the CBA, regarding teacher evaluation, provides that "[n]o teacher will be disciplined, reprimanded, reduced in rank or compensation or deprived of any professional advantage without just cause."

Finally, article 17.10 of the CBA, governing extended leaves of absence, provides as follows:

> "A teacher with six (6) or more continuous years of service in the Marshfield Public Schools may be granted an Extended Leave of Absence of up to two (2) years without pay for personal reasons. At its discretion, the School Committee may grant such leave to a teacher with less than six (6) or more continuous years of service in the Marshfield Public Schools. Any such leave shall commence on September 1st of the school year in which taken and terminate on June 30th of the same or subsequent school year(s), depending upon the length of the leave granted."

3. *Facts as found by the arbitrator.* O'Sullivan was hired in

---

[1]The initial contract governs the relationship between the school district and a teacher without professional teacher status, and provides that the contract "shall be renewed annually by operation of law during the period of [the teacher's] first three (3) years of continuous employment unless the teacher has been notified in writing prior to June [15] . . . that the contract will not be renewed for the following year." The initial contract also provides that it may be terminated by mutual consent at any time, and that the teacher may resign for good reason as long as certain requirements are met.

December, 2000, by the district to teach students with disabilities in the alternative high school program. This job required an "MA Certification in Moderate Special Needs." O'Sullivan did not have any State teaching licenses when he was hired, but he obtained his preliminary license to teach English on March 21, 2001.

O'Sullivan's preliminary license to teach English was set to expire in March, 2006. In December, 2005, he applied for an initial license to teach English and an initial license as a teacher of students with moderate disabilities (SPED license). Eventually, O'Sullivan and the district determined that O'Sullivan needed to prove his competency in three areas to receive a SPED license: (1) knowledge of Federal and State special education laws; (2) knowledge of individualized education program development and preparation; and (3) knowledge of services provided by other agencies. According to the Department of Elementary and Secondary Education (DESE), knowledge of these three areas could be demonstrated by course work for college or university credit, seminars or workshops, or experience. After working with his school supervisor, O'Sullivan determined that the best way for him to demonstrate his competency in these areas was through experience.

What followed was a great deal of miscommunication among O'Sullivan, DESE, and the district's personnel secretary, Linda Ochiltree. There were several exchanges regarding the adequacy of O'Sullivan's proof that he satisfied the competencies, including some confusion regarding whether O'Sullivan's chosen route of demonstrating proof of competency through experience was appropriate. In particular, O'Sullivan was confused as to whether his application was pending, or whether the license had been denied because more information or materials were required by DESE. In February, 2007, O'Sullivan informed the district, via Ochiltree, that his application for a preliminary SPED license may have been denied.

On May 8, 2007, the superintendent wrote a letter to O'Sullivan informing him that the district had obtained a waiver from DESE allowing him to teach without a license for the 2006-2007 school year. The letter also informed him that the superintendent wished to discuss O'Sullivan's licensing status for the

2007-2008 school year. O'Sullivan responded by letter on May 17, conveying his confusion regarding the status of his licensing application and whether it was pending or had been denied. The superintendent did not respond.

The district's waiver to employ O'Sullivan without a license expired in June, 2007. At that time, O'Sullivan still did not possess a teaching license. However, he resumed his employment as a Marshfield teacher in September, 2007. In November, 2007, the school district submitted another request to waive the license requirement for O'Sullivan for the 2007-2008 school year. Later that month, DESE denied the request and notified the superintendent by letter. O'Sullivan, however, continued to teach.

In April, 2008, O'Sullivan realized that in order to successfully demonstrate that he met the required competencies through experience, he needed a "district letter" — on district letterhead — attesting to his experience. O'Sullivan requested the letter, and after some additional back-and-forth with DESE, the superintendent wrote to O'Sullivan in May, 2008, stating that he would not provide such a letter because he did not view direct field experience ("i.e., being a teaching member of the Marshfield Public Schools Special Education Department"), without more, as sufficient to demonstrate the necessary competencies. On June 24, 2008, the superintendent nevertheless contacted the school principal, the school's special education director, and the department head, requesting that one of them send the letter for O'Sullivan instead. None of them provided the letter.

In July, 2008, O'Sullivan started exploring whether he had enough practicum or professional development point (PDP) credits to satisfy the competency requirement, as an alternative to demonstrating competency through his experience.[2] Although

---

[2]During the relevant time period, "practicum/practicum equivalent" was defined in 603 Code Mass. Regs. § 7.02 as "[a] field-based experience within an approved program in the role and at the level of the license sought, during which a candidate's performance is supervised jointly by the sponsoring organization and the supervising practitioner and evaluated in a Performance Assessment for Initial License." A "PDP" is a professional development point, "a unit of measurement of professional development activities. One clock hour is equivalent to one professional development point." 603 Code Mass. Regs. § 44.02 (2000). Teachers are required to obtain a prescribed number of PDPs as part of the license renewal process.

O'Sullivan wrote to both Ochiltree and to the assistant superintendent, there was no evidence that either responded to his questions regarding whether he could satisfy DESE's requirements in this way.

On June 30, 2008, the district had received notice that the waiver for the 2007-2008 school year, which had previously been denied, was approved retroactively. On July 1, 2008, the district applied for a third waiver to employ O'Sullivan without a license, this time for the 2008-2009 school year. DESE denied the request on July 29, 2008, and the superintendent received the denial letter on August 6, 2008. Except for the date and reference number, this letter was identical to the letter that the superintendent received in November, 2007, denying the waiver for the 2007-2008 school year, which DESE later approved retroactively.

On August 12, 2008, the superintendent sent a letter to O'Sullivan stating that because O'Sullivan did not have a license and the waiver had been denied, O'Sullivan was no longer eligible for employment and no position would be available to him for the 2008-2009 school year. O'Sullivan responded on August 28, 2008, requesting a personal, unpaid leave of absence for the 2008-2009 school year to complete the licensing requirements. The superintendent denied this request on September 29, 2008, again citing his position that O'Sullivan was no longer eligible for employment. Thus, in effect, the employment relationship between the district and O'Sullivan ended.

4. *Arbitration decision and award.* The association grieved the decisions to terminate O'Sullivan and to deny his request for a personal leave of absence, and the arbitrator heard the grievances on September 14, 2009, and April 20, 2010. The arbitrator framed the issues before her as follows:

"Are the grievances . . . substantively arbitrable?

"If yes, did the Superintendent of Marshfield Schools violate Section 17.10 or Section 12.7 of the parties' collective bargaining agreement when he denied Gerard F. O'Sullivan's request for a leave of absence on September 29, 2008?

"If so, what shall the remedy be?

"Did the Superintendent of Marshfield Schools violate the parties' collective bargaining agreement when Gerard F. O'Sullivan's employment was not continued for the 2008-2009 school year?

"If so, what shall the remedy be?"

The arbitrator found the grievance to be substantively arbitrable.[3] She determined that the lack of a license or waiver did not, in and of itself, extinguish O'Sullivan's professional status or his collective bargaining rights, including his right to pursue a grievance. Although she found the school committee could have taken steps pursuant to G. L. c. 71, § 42, and article 12.7 of the CBA to terminate O'Sullivan's employment on these grounds, it chose not to do so. In reaching her determination that O'Sullivan retained professional teacher status and associated rights under the CBA, the arbitrator relied in part on the parties' past practices. She found the school committee provided no evidence as to "how or why the district was able to continue Mr. O'Sullivan's employment without any license or waiver in 2006 and 2007, but in 2008, the same circumstances resulted in the immediate dissolution of the employment relationship without any action on the part of the Superintendent, the School Committee, or the employee."

The arbitrator then interpreted article 17.10 of the CBA (the leave of absence provision) to provide O'Sullivan with the right to an unpaid leave of absence, concluding that the "motivating and principal reason for denying the leave request was the claim [which she rejected] that Mr. O'Sullivan was not an employee and not entitled to benefits under the [CBA]."

Acknowledging that she could not order a remedy contrary to law, and that the lack of a license or waiver rendered O'Sullivan ineligible to be employed as a teacher, the arbitrator determined that the school committee had not established that the "law prohibits a school district from employing unlicensed educators who are *on an unpaid leave of absence*, who are not employed

---

[3]No issue has been raised regarding the timeliness of the grievance.

*as a teacher,* who are not *teaching,* and who are *not serving* in a role covered by the statute." The arbitrator found in O'Sullivan's favor, concluded that he had not been terminated and thus remained an employee, and ordered his reinstatement for a one-year unpaid leave of absence for the 2008-2009 school year. She "further ordered [that he be made] whole for the loss of any back wages, benefits, or seniority he would have received but for the improper decisions to end his employment and to deny his request for leave without pay, which back wages and benefits must be reduced by any wages or benefits he would not have received but for those improper decisions."

*Discussion.* 1. *Standard of review.* The power of a court to review an arbitration decision and award is extremely limited. See *School Dist. of Beverly* v. *Geller,* 435 Mass. 223, 228 (2001) (Cordy, J., concurring). The narrow grounds on which a court may vacate an arbitral award are set forth in G. L. c. 150C, § 11, and include, in pertinent part, that "the arbitrators exceeded their powers or rendered an award requiring a person to commit an act or engage in conduct prohibited by state or federal law." G. L. c. 150C, § 11(*a*)(3), inserted by St. 1959, c. 546, § 1. See *School Comm. of Pittsfield* v. *United Educators of Pittsfield,* 438 Mass. 753, 759 (2003), quoting from *Duxbury* v. *Duxbury Permanent Firefighters Assn., Local 2167,* 50 Mass. App. Ct. 461, 464 (2000) ("[W]e look only to determine if the arbitrator here exceeded his scope of reference, acted against clearly defined public policy, or ordered conduct prohibited by State or Federal law"). "In determining whether an arbitrator exceeded [her] authority . . . judicial review of the award is independent." *Local 589, Amalgamated Transit Union* v. *Massachusetts Bay Transp. Authy.,* 392 Mass. 407, 411 (1984). Absent proof of one of these prohibited grounds, however, "a reviewing court is 'strictly bound by the arbitrator's factual findings and conclusions of law, even if they are in error.' " *School Comm. of Lowell* v. *Robishaw,* 456 Mass. 653, 660 (2010), quoting from *School Comm. of Pittsfield* v. *United Educators of Pittsfield, supra* at 758.

2. *Preclusive effect of G. L. c. 71, § 38G.* The school committee contends that the arbitrator exceeded her authority and that the award violates G. L. c. 71, § 38G, and the public policy

it embodies. The committee contends that "[p]roper certification (or waiver) [under § 38G] is a precondition upon which access to any and all subsequent benefits of teacher employment is predicated," including the procedural termination protections of G. L. c. 71, § 42, and collective bargaining rights. According to the school committee, the lack of a license or waiver extinguishes these other statutory and collective bargaining rights as a matter of law, and the arbitrator's decision rejecting this preclusive effect and finding that O'Sullivan retained certain collective bargaining rights was in excess of the arbitrator's powers and violated public policy.

The preclusive effect of G. L. c. 71, § 38G, is a question of law for this court. See, e.g., *Alexander* v. *Gardner-Denver Co.*, 415 U.S. 36, 57 (1974) ("[T]he specialized competence of arbitrators pertains primarily to the law of the shop, not the law of the land"). We interpret the different provisions here as serving different purposes. Section 38G expressly governs the State's teacher licensing process. It defines the relationship "between individual teachers and the Commonwealth," not "the employment relationship between teachers and their school districts." *Massachusetts Fedn. of Teachers, AFT, AFL-CIO* v. *Board of Educ.*, 436 Mass. 763, 782 (2002). In contrast, G. L. c. 71, § 42, expressly governs the dismissal of a "teacher who has been teaching in a school system" and achieved professional teacher status. Cf. *Lutz* v. *School Comm. of Lowell*, 366 Mass. 845, 845 (1974) (explaining that teacher who never received license or achieved professional teacher status lacked G. L. c. 71, § 42, rights). Although § 38G defines eligibility requirements for employment as a teacher in the public schools, it does not in any way define the requirements for termination of employment and the associated rights of employment for those who have been previously licensed and achieved professional teacher status. Those requirements are addressed in § 42 and in collective bargaining agreements. Section 38G expressly states: "Except as otherwise specifically provided in this section, no rights of employees of a school district under the provisions of this chapter shall be impaired by the provisions of this section." Moreover, it is not just the statutory language, but also the practical workings of the licensing scheme, particularly the

availability of retroactive waivers, that preclude the conflation of the State licensing and school district termination processes.

This is not to say that the processes are not interrelated. As the arbitrator found, the absence of a license or waiver provides substantive grounds for termination in the G. L. c. 71, § 42, process. Section 42 specifically references incapacity as grounds for terminating a teacher with professional teacher status. See G. L. c. 71, § 42, third par. Likewise, absence of a license or waiver would provide substantive grounds to be considered for termination under the "for cause" provisions of the CBA, but it does not automatically extinguish all of the employee's rights.[4] Thus, G. L. c. 71, § 38G, can and should be read in harmony with the procedural termination provisions set out in § 42, and the continued existence of collective bargaining rights of affected employees. See *Massachusetts Fedn. of Teachers, AFT, AFL-CIO* v. *Board of Educ.*, 436 Mass. at 783 ("[T]here is no conflict between the challenged regulations, which govern State teacher recertification, and collective bargaining law, which governs specific terms and conditions of employment"); *School Comm. of Newton* v. *Newton School Custodians Assn., Local 454, SEIU*, 438 Mass. 739, 747, 751 (2003); *School Comm. of Pittsfield* v. *United Educators of Pittsfield*, 438 Mass. at 761-762 ("Nor did the Legislature's commitment to school reform trump the Commonwealth's strong public policy favoring collective bargaining between the public employers and employees over the conditions and terms of employment"). Cf. *Dedham* v. *Labor Relations Commn.*, 365 Mass. 392, 402 (1974); *Fall River* v. *AFSCME Council 93, Local 3177, AFL-CIO*, 61 Mass. App. Ct. 404, 410 (2004) (collective bargaining agreement and civil service statute can be read harmoniously).

The arbitrator also did not exceed her authority in finding that in the absence of termination proceedings pursuant to G. L.

---

[4]We need not decide whether the just cause provisions and procedures in the CBA have been superseded by the just cause provisions and procedures in G. L. c. 71, § 42, because O'Sullivan was not terminated pursuant to either process. See generally *School Comm. of Chicopee* v. *Chicopee Educ. Assn.*, 80 Mass. App. Ct. 357 (2011). Moreover, even if the just cause provisions in the contract are superseded by § 42, other provisions in the contract, such as the leave of absence provision, remain in effect and enforceable absent a § 42 termination.

c. 71, § 42, the employment relationship between O'Sullivan and the district continued, even though O'Sullivan no longer held a teaching license and DESE had denied the district a waiver. The continuing employment relationship afforded O'Sullivan standing to grieve his claims and the right to request an unpaid leave of absence pursuant to article 17.10 of the CBA. The arbitrator also properly relied on past practices of the parties in determining that the lack of license or waiver did not automatically end the employment relationship, and the associated employment rights. Cf. *Duxbury* v. *Duxbury Permanent Firefighters Assn., Local 2167*, 50 Mass. App. Ct. 461, 465 (2000) ("[I]n instances where the provisions of an agreement are not clear and unequivocal, the arbitrator may rightly look to past practice to resolve ambiguities").

The arbitrator further determined that the superintendent wrongly denied O'Sullivan's request for a personal leave of absence under the CBA, and we cannot say that she exceeded her powers in reaching this conclusion. The arbitrator found that the superintendent denied the leave request on the ground that O'Sullivan's employment had terminated by operation of law, and he was therefore no longer entitled to the rights, such as personal leave, provided by the CBA. Having found that O'Sullivan's contractual rights had not automatically terminated, the arbitrator concluded that the superintendent's stated basis for denying the requested leave was unreasonable based on the terms of the CBA and long-term teacher's contract. The arbitrator also relied on the express terms of article 17.10 of the agreement as a basis for awarding the leave. As her award "draws its essence from the collective bargaining agreement" and the parties' past practices, we cannot conclude that she exceeded her powers in this regard. *School Dist. of Beverly* v. *Geller*, 435 Mass. at 229 (Cordy, J., concurring), quoting from *United Steel Wkrs.* v. *Enterprise Wheel & Car Corp.*, 363 U.S. 593, 597 (1960). *Duxbury* v. *Duxbury Permanent Firefighters Assn., Local 2167*, 50 Mass. App. Ct. at 465. Furthermore, even if her interpretations of article 17.10 and the past practices were erroneous, we are bound by those interpretations. See *School Comm. of Lowell* v. *Robishaw*, 456 Mass. at 660-661.

3. *Award in violation of law or public policy.* Under G. L.

c. 150C, § 11(*a*)(3), an arbitrator's award must be vacated if the award requires a party to commit an act or engage in conduct prohibited by law or in violation of public policy. Thus, "[a]lthough the scope of review under G. L. c. 150C, § 11, is 'restrictive in not permitting reversal based on an arbitrator's legal errors,' a reviewing court may reverse an arbitrator's decision where the arbitrator exceeds his authority by disregarding the governing law." *School Comm. of Lowell* v. *Robishaw*, 456 Mass. at 662, quoting from *Goncalo* v. *School Comm. of Fall River*, 55 Mass. App. Ct. 7, 10 (2002). See *Plymouth Carver Regional Sch. Dist.* v. *J. Farmer & Co.*, 407 Mass. 1006, 1007 (1990); *Boston* v. *Boston Police Patrolmen's Assn.*, 443 Mass. 813, 818 (2005) ("[E]xtreme deference to the parties' choice of arbitration does not require us to turn a blind eye to an arbitration decision that itself violates the law. We do not permit an arbitrator to order a party to engage in an action that offends strong public policy"); *Massachusetts Bay Transp. Authy.* v. *Boston Carmen's Union, Local 589, Amalgamated Transit Union*, 454 Mass. 19, 25 (2009) (award that violates public policy is award that must be vacated under G. L. c. 150C, § 11[*a*][3], because arbitrator exceeded her powers). We are not bound by the arbitrator's interpretation of the relevant statutes or public policy in making this determination. See *Massachusetts Bay Transp. Authy.* v. *Local 589, Amalgamated Transit Union*, 406 Mass. 36, 40 (1989) (appellate court "need not defer to arbitrator's interpretation of relevant statutes").

The school committee argues that the award must be vacated because it violates G. L. c. 71, § 38G, and 603 Code Mass. Regs. § 7.14(9)(a) (2005)[5] and the policy contained therein. It contends that the district could not legally continue to employ O'Sullivan as of August, 2008, when O'Sullivan still had not obtained a teaching license and DESE had denied the superintendent's waiver request for the 2008-2009 school year. According to the school committee, the arbitrator's award must therefore be vacated because it requires the school committee to continue an illegal relationship with O'Sullivan by reinstating him and granting his request for a leave of absence.

---

[5]Title 603 Code Mass. Regs. § 7.14(9)(a) has since become 603 Code Mass. Regs. § 7.15(9)(a) (2012).

As we have previously explained, G. L. c. 71, § 38G, governs the licensing of public teachers in the Commonwealth, not the termination of employment and any associated rights of those who had previously been licensed and achieved professional teacher status, which is governed by G. L. c. 71, § 42. The arbitrator carefully considered the statutory requirements, recognizing that O'Sullivan retained his professional teacher status and associated employment rights, as no termination process had been undertaken pursuant to § 42. She also recognized that § 38G required him to have a license or a waiver to be eligible for "employment as a teacher." The essence of her award was an unpaid one-year leave of absence, thereby allowing O'Sullivan time to try to satisfy the licensing requirements. It did not return him to the classroom without a license or a waiver. The award does not violate § 38G.[6]

Neither does the award violate the public policy requiring licensure of public school teachers in order to further the Commonwealth's goals of ensuring the quality education of children attending public schools. See *Massachusetts Fedn. of Teachers, AFT, AFL-CIO* v. *Board of Educ.*, 436 Mass. at 765, quoting from 603 Code Mass. Regs. § 44.01 ("The purpose of the Massachusetts recertification system is to 'enhance education through professional development for educators that meets high standards of quality . . . in order to assist students in meeting state learning standards' "). The standard for determining that an award must be vacated for violating public policy is narrow. See *Boston* v. *Boston Police Patrolmen's Assn.*, 443 Mass. at 819, quoting from *Massachusetts Hy. Dept.* v. *American Fedn. of State, County & Mun. Employees, Council 93*, 420 Mass. 13, 19 (1995) ("If an award is permissible, even if not optimal for the furtherance of public policy goals, it must be upheld"). An award may only be vacated on these grounds "where an

---

[6]The school committee also argues in passing that the award violates G. L. c. 71, § 59B, which provides in relevant part that "[p]rincipals . . . shall be responsible, consistent with district personnel policies and budgetary restrictions and subject to the approval of the superintendent, for hiring all teachers . . . and for terminating all such personnel." A principal's powers, however, are to be exercised in accordance with G. L. c. 71, § 42, and any collective bargaining agreements. The award did not, therefore, violate G. L. c. 71, § 59B, or the policy reflected therein.

employee's conduct implicates a well-defined, dominant, public policy ascertained by reference to specific law or legal precedent; the conduct is integral to the employee's duties; and such conduct would require an employee's dismissal." *School Comm. of Lowell* v. *Robishaw*, 456 Mass. at 664. "To prevail, the [employer] must therefore demonstrate that public policy requires that [the employee's] conduct, as found by the arbitrator, is grounds for dismissal, and that a lesser sanction would frustrate public policy. . . . 'The question to be answered is not whether [the employee's conduct] itself violates public policy, but whether the agreement to reinstate him does so.' " *Boston* v. *Boston Police Patrolmen's Assn.*, 443 Mass. at 819, quoting from *Eastern Associated Coal Corp.* v. *United Mine Wkrs., Dist. 17*, 531 U.S. 57, 62-63 (2000). See *Massachusetts Hy. Dept.* v. *American Fedn. of State, County & Mun. Employees, Council 93*, 420 Mass. at 19 ("Arbitration awards reinstating employees are therefore upheld if the public policy, while disfavoring the employees' conduct, does not require dismissal").

Even if the first two requirements were met here, the third one is not: the arbitrator's narrowly tailored remedy reinstating O'Sullivan to a one-year unpaid leave of absence, during which he would not hold a teaching position or engage in the act of teaching but, rather, work or study toward achieving his license, does not violate public policy.[7]

*Conclusion.* We conclude that the arbitrator did not exceed her authority in determining that O'Sullivan, who had previously been licensed and achieved professional teacher status, and who had not been terminated pursuant to G. L. c. 71, § 42, was still an employee under the CBA and was entitled to a one-year unpaid leave of absence under that agreement to work towards his licensing requirement. We also conclude that the award of a one-year unpaid leave of absence does not require

[7]We also do not interpret the arbitrator's award of back pay to entitle O'Sullivan to any such pay unless he did in fact successfully perform the work or study necessary to satisfy the licensing requirements during that one-year unpaid leave of absence. As the Superior Court judge noted, "[i]f at the end of that year, O'Sullivan lacks a valid license and the Superintendent chooses not to seek a waiver the [school] committee may dismiss him under the CBA."

the school committee to violate G. L. c. 71, § 38G, or the public policy reflected therein.

*Judgment affirmed.*